AUGUSTUS O. GIRARD, Respondent, v. THE ST. LOUIS CAR-WHEEL COMPANY, Appellant.

St. Louis Court of Appeals, June 2, 1891.

1. **Pleading**: RELEASE PROCURED THROUGH FRAUD. A plaintiff, who has been induced by fraud or undue influence to release his right of action, may sue upon such right of action without first obtaining the annulment of the release by suit in equity; and if such release is pleaded as a defense to his action at law he may in his reply set up the fraud or undue influence in avoidance of it.

2. **Release :** SUFFICIENCY OF EVIDENCE OF FRAUD. Such a release stands upon the footing of a compromise, and should be upheld when fairly made. It should not be vacated for fraud in an action at law, unless the evidence of the fraud, if believed, and the circumstances attending its execution, are such as would warrant a chancellor in setting it aside. And *held* that the evidence in this cause was sufficient under this rule.

3. **Fraud :** UNUSUAL PROVISIONS IN A RELEASE. An unusual provision in an instrument, whereby the draftsman of the instrument obtains an advantage over the other party, excites suspicion of a fraudulent motive. This rule is applied herein to a provision in the release of a cause of action, stating that the party making the release agreed to release "deliberately. of his own free will, and without any undue influence from anyone."

4. ——— : RESCISSION OF CONTRACT : RESTORATION OF BENEFITS RECEIVED. If a party to a contract seeks to have it annulled because he was induced to enter into it by fraud, he must ordinarily restore to the other party the consideration received by him under it ; but he is not bound to restore such consideration, where the contract consists of the release of a cause of action on his part, and the consideration received was less than what is due him for such cause of action.

5. ——— : ———. If a party to a contract does not labor under a disability or infirmity, his mere failure, through his own fault or neglect, to read it or inform himself of its contents, is not sufficient to annul it or overcome its legal effect as to him.

6. **Instructions :** NEGLIGENCE. An instruction was predicated upon the hypothesis of negligence on the part of the defendant in raising a weight, when, strictly speaking, the injury sued for resulted from the want of ordinary care in attempting to get the weight down after it had been partly raised with an insufficient appliance, and could not safely be raised any further. *Held*, that an assignment of error on the ground of such distinction was too refined for practical purposes, and that the giving of the instruction did not constitute prejudicial error.

7. ——— : EXCESSIVE NUMBER. The defendant in the cause offered seventeen instructions. *Held* that, under the issues of this cause, that number was excessive, and that the trial court might properly have refused all of them for that reason.

8. **Negligence :** MASTER AND SERVANT. A crane for the raising of heavy weights was firmly attached to a foundry building, and used in connection with the foundry business. While a very heavy weight was being raised with it by employes at the foundry, the building began to crack, owing to the strain to which it was subjected. Thereon the superintendent of the workmen directed

those engaged in lifting the weight to swing the weight around, knowing that the commencement of this operation would increase the strain upon the building. *Held* that, although none of the employes at the foundry were at that moment at work in the building, still, since they were liable to return to work in it, it was negligence upon the part of the superintendent not to warn them of the danger of what he was about to do.

*Per Biggs, J., dissenting :*

9. **Fraud:** RESCISSION OF CONTRACT. Where a contract has been obtained by fraud, the defrauded party may rescind it without the aid of any court, if he acts promptly after the discovery of the fraud ; but, in such case, he must return, or offer to return, whatever of value he has received on account of such contract. And this rule is applicable to the compromise and release of a disputed claim for less than its amount.

AFFIRMED ( *and certified to the supreme court* ).

*Fisse & Tiffany*, for appellant.

*A. R. Taylor*, for respondent.

THOMPSON, J.—This action is brought by an employe against his employer to recover damages for a personal injury on the theory of negligence. There was a trial before a jury, and a verdict and judgment in favor of the plaintiff in the sum of $1,500. The defendant appeals to this court, and assigns errors in such a way as requires us to set out the pleadings. The petition was as follows :

"The plaintiff states that the defendant is, and at the times hereafter mentioned was, a corporation by virtue of the law of Missouri, and owned and operated the foundry, building and appliances herein described ; that prior to and on the thirteenth day of September, 1889, the plaintiff was in the service of the defendant at its foundry at or near the junction of the Missouri Pacific railway and Cabanne avenue, in the city of St. Louis, as a molder ; that on said day, whilst the plaintiff was in the due discharge of his duty as such molder in said foundry building, the timbers or stringer of

said building, a piece of timber about eighteen feet long and nine inches wide, and seven inches thick, fell upon the plaintiff injuring plaintiff's back and spine, breaking his ribs, and also his left arm at the wrist, and also lacerating and wounding plaintiff's head and face. And plaintiff avers that said timber was so caused to fall upon and injure him through the negligence and carelessness of defendant's superintendent in charge of defendant's servants in another department of defendant's business; that defendant had on the outside of said building a certain derrick or crane used for lifting heavy weights; that said crane was sustained by certain rods of iron, which ran from said crane through the walls of said building, so as to hold said crane steady when heavy weights were being lifted; that on said day, whilst said superintendent, defendant's agent in charge of said work, was causing an iron yoke to be raised, owing to the said yoke being of too great weight to be sustained by said crane and its fastenings aforesaid, said rods pulled out a portion of the wall of said building, thereby causing said timber to fall upon and injure the plaintiff as aforesaid. And plaintiff avers that said superintendent and agent of the defendant was negligent in thus undertaking to raise said yoke with said appliance, which was insufficient therefor, and thereby caused said timber to fall upon and injure the plaintiff. And plaintiff further avers that defendant was negligent in furnishing and maintaining said appliance, which was unfit and insufficient for the use to which defendant was applying it, in that it would not sustain said heavy weight, and thereby defendant directly contributed to cause plaintiff's said injury; that, by his injuries, sustained as aforesaid, plaintiff has suffered, and will hereafter suffer, great pain of body and mind; has been permanently crippled and disabled from labor; has incurred, and will hereafter necessarily incur, large expenses for medicines, medical

Girard v. The St. Louis-Car-Wheel Co.

attendance and nursing, and was, and is, damaged in the sum of $15,000, for which sum he prays judgment."

The answer of the defendant is as follows :

"Now comes the above-named defendant, by its attorneys, and, for answer to the petition of the said plaintiff filed in this cause, says that it denies each and every allegation contained in said petition.

"Wherefore, having answered herein, said defendant prays for judgment with its costs.

"*Second.* For another and further defense to the said petition, this defendant says that, if plaintiff suffered injuries as alleged in said petition, which defendant denies, such injuries were not due to any neglect or want of care on part of this defendant, but were due altogether to the negligence of the said plaintiff, which said negligence of the plaintiff, defendant says, directly contributed to and brought about said injuries, if the plaintiff in fact suffered any such injuries. And the defendant further says that, if any timber or timbers of its said building fell upon or injured the plaintiff, which it denies, the said plaintiff had full notice of the fact, that such timbers were likely to fall upon and injure him if he remained in proximity thereto, and the defendant says that, notwithstanding such full notice, and notwithstanding ample opportunity to said plaintiff to remove from the neighborhood of any such timbers, the plaintiff nevertheless remained under the same, and thereby voluntarily placed himself in a dangerous situation, knowing at the time that such place was dangerous, and suffered any injuries—if any he did suffer—in consequence of such want of care on his part.

"Wherefore, defendant says the plaintiff ought not to be allowed to have or maintain his said action, and defendant, therefore, prays judgment herein with its costs.

"*Third.* For another and further defense to the said pretended cause of action of said plaintiff set out in his petition, this defendant says that the said plaintiff ought

not to be permitted to have or maintain this action against it, for the reason that heretofore, and after the date when as alleged in said petition the plaintiff suffered injuries in the manner stated in said petition, the said plaintiff entered into an agreement with this defendant in words and figures as follows, to-wit:

" ' This agreement entered into this fourteenth day of September, eighteen hundred and eighty-nine ( September 14, 1889 ), at St. Louis, Missouri, between A. O. Girard ( known on our books as A. O. Raymond, check number 306 ), of the one part, and the St. Louis Car-Wheel Company, both of St. Louis, Missouri, of the other part, witnesseth:

" ' That whereas said Girard, who was up to September 13, 1889, working as a molder in the employ of the St. Louis Car-Wheel Company, sustained injuries by the accidental falling of timbers, whereby he will be incapacitated for such service as a molder, temporarily, the said car-wheel company, on their part, proposes to furnish and pay for all the medical attendance necessary for his recovery from said injuries sustained by said accident, and to keep his name on its pay roll at the uniform wages per day, for all working days, which he has been up to this time credited, and in any other way in their power assist in his recovery until he is physically sufficiently recovered from said accident, evidenced by physician's certificate, to resume work, and that on his part, beyond the above obligation of the St. Louis Car-Wheel Company, he relinquishes all other claims whatsoever as to them, and that he agrees to this deliberately, and of his own free will, and without any undue influence from anyone. The said parties in evidence of which, and in good faith, sign this the date first herein written.

" ' A. O. GIRARD.

" ' ST. LOUIS CAR WHEEL Co.

" ' September 15, 1889.

" ' By R. W. GREEN, Secretary.

" ' Witness, W. E. WAKEFIELD."

" Which said agreement, this defendant says, was made, accepted and received by both the plaintiff and this defendant in full satisfaction and discharge of all and every claim, existing in favor of the said plaintiff, against this defendant, on account of the injuries complained of in said petition.

"And the defendant says, that, in pursuance of the said agreement above set forth, it did provide and furnish and pay for the medical services necessary for the recovery of said plaintiff from the injuries alleged to have been sustained by him, on account of said accident, so far as it was permitted to do so by said plaintiff, and did and provided for him all other things requested by him and necessary to promote his said recovery, so long as he remained in the city of St. Louis, and so long as it was permitted so to do.

"But the defendant further says that, about the first day of November, 1889, said plaintiff departed from the city of St. Louis, without communicating to this defendant his intention so to remove, and his whereabouts remained unknown to this defendant for some time; that subsequently thereto, when the plaintiff's residence had become known to this defendant, the defendant again procured a competent physician to visit him, and offered the plaintiff the services of said physician at its own cost, as it was bound to do by the terms of its said agreement above set out with the plaintiff, but the said plaintiff refused to accept the services of said physician.

"The plaintiff further says that, since the date of the alleged injuries to the plaintiff, it has kept his name upon its pay roll, as provided in said agreement, at the uniform wages per day for all working days, which he had been up to the time of said injuries earning and credited, and is ready and willing to pay unto the said plaintiff all sums of money, which under the said agreement it undertook and agreed to pay, and avers its willingness now as ever in all matters and things to

fully perform and carry out the agreements by it assumed and contained in the writing above set out.

"Wherefore, the defendant says that by the said writing and agreement above mentioned the said plaintiff has relinquished all claims against it, excepting its obligations under said contract, and has in consideration of the said contract discharged and released this defendant from all and every claim or liability to him for damages on account of any injuries sustained by him as alleged in said petition.

"Wherefore, the defendant prays judgment herein with its costs."

To this answer the following reply was made:

"Now comes plaintiff, and, for reply to the answer herein, denies the allegations thereof, except as hereinafter specifically admitted. And for reply to the third alleged defense this plaintiff avers that the alleged agreement set forth as the third defense in said answer was without any consideration and void.

"And plaintiff doth further aver that the said alleged agreement was obtained from this plaintiff by the gross fraud and misrepresentations and imposition by the defendant and its agents, practiced upon the plaintiff at the time of the alleged making thereof.

"That, at the time of the alleged making thereof, this plaintiff was in the deepest distress and mental and bodily pain and anguish, caused by the injuries set forth in his petition; that he was at said time not of contracting mind, and was unable through his bodily and mental condition to understand or comprehend the contents of said agreement, and did never assent to the terms thereof; that defendant by its agents, R. W. Green, and W. E. Wakefield, with the fraudulent purpose and design of cheating and defrauding the plaintiff out of his right of action set forth in his petition, and well knowing that plaintiff was incapable by reason of his mental pain and bodily suffering to understand or comprehend the contents or nature of said alleged

agreement, by undue influence, taking advantage of plaintiff's said condition, induced plaintiff to sign said agreement without knowing or understanding the contents thereof.

"That, at the time of the alleged making of said agreement, the plaintiff was of weak and enfeebled mind by reason of said injuries, and his will was subjected to that of defendant's said agents, and plaintiff did not have mental will or understanding to oppose the will of defendant's said agents, and defendant's said agents, fraudulently taking advantage of the weak and enfeebled condition of plaintiff's mind and will, for the purpose of cheating him, as aforesaid, did, by reason of plaintiff's said enfeebled condition of mind and body, by subjecting his will to theirs, induce and cause plaintiff to sign said alleged agreement. Wherefore, plaintiff says said alleged agreement is of no effect and void, and he prays judgment as in his petition."

The evidence adduced at the trial tended to show that the defendant was a corporation, employed in manufacturing car wheels, and other castings, in the city of St. Louis, and that the plaintiff was employed as a molder. The defendant's shop consisted of a one-story building, having a front of seventy feet on Cabanne avenue, and with that width running westwardly about four hundred feet. Outside this shop, near to its southeast corner, there was located a large crane, or derrick, consisting of an upright mast and a swinging boom, secured near the lower end of the mast and projecting diagonally therefrom. This crane was secured by guy rods, that ran back, and were fastened to various parts of the shop. One of these guy rods extended in a diagonal direction from the top of the mast to the southeast corner of the building, where it was fastened to the building. Others of them ran straight back directly to the building, and were fastened to the trusses that formed the roof. In addition to the last-mentioned guy rods there were two heavy pieces of

timber, running in the same direction as the last-mentioned rods, and likewise secured to the trusses that supported the roof and formed part of the framework of the building. The trusses extended across the entire width of the building, and were placed some distance apart. Brace timbers, crossing each other diagonally, extended from one truss to another.

The evidence also tended to show that, on the thirteenth day of September, 1889, a heavy yoke casting, intended to be used in the construction of the roadway of a cable railroad at a point where it crosses another cable railroad, had been moved out of the shop with a part of the core taken out, and attached to the crane for the purpose of lifting it out of the way. The weight of this casting, with the sand which remained in it, is variously stated by the witnesses at from four to eleven tons. It was moved out under the orders of the defendant's superintendent, and placed in charge of another employe of the defendant, who was designated as "foreman of laborers." He, with the laborers assisting him, caused it to be attached to the crane and partly lifted for the purpose of swinging it around and getting it out of the way, when suddenly the guy rod, which extended to the corner of the building, pulled loose from its fastenings, tearing loose the corrugated covering of the building, and making a loud noise, which attracted the men working in the foundry to the door to see what was the matter. The evidence also tended to show that the defendant's foreman of laborers, as soon as he saw that the fastenings of the crane to the building had given way, started to let the weight down; but that the defendant's superintendent appearing on the spot, and fearing that the jar of letting it down would disturb the fastenings more, ordered him to desist. There was then an interval, variously stated by the witnesses at from fifteen to thirty minutes, during which the crane with its weight and the building remained *in statu quo*. It should be remarked that the

plaintiff's testimony tends to show that he did not quit his work during this interval, but continued to work right on, unmoved by the noise, the danger and the excitement. At the expiration of this interval, defendant's superintendent determined to swing the yoke around, still attached as it was to the crane, although one of the guy rods attaching the crane to the building had thus been pulled out, and although, as the defendant's testimony tends to show, the building was cracking continually from the stress made upon it by the weight suspended to the crane. Notwithstanding the evident danger, under the circumstances detailed, attending this operation, he did not give any warning to the men at work within the building that he was about to attempt it. The reason, which he gives for not warning the workmen inside the building, was that he looked inside, and saw no workmen at work within thirty feet of the wall which was the place of danger, and consequently concluded that it was not necessary to give any warning. If he had given such warning, it is scarcely to be doubted that the plaintiff would not have been hurt; for, according to the plaintiff's testimony, he was at work at or near what proved to be the place of danger, while, according to all the evidence, if the superintendent's statement was true. he must have returned to that place, which it is reasonable to suppose he would not have done, if he had been warned of the danger.

The attempt thus made by the superintendent to swing the weight around had the effect of subjecting the building to such further strain as detached a beam from the roof of it, above the place where the plaintiff was working, which fell on him, breaking both bones of his left forearm near the hand, causing a severe contusion on the side or back near the tenth rib, causing several contusions, unimportant in character, on his head, and injuring him severely.

We may stop at this point, and, with this view of the pleadings and the evidence, dispose of two assignments of error which are too plainly untenable to require extended discussion. The first is that there was no evidence of negligence to take the case to the jury under the petition; in other words, that the negligence, which the plaintiff's evidence tended to prove, was not the negligence charged in the petition. The negligence charged is attempting to raise a weight with an appliance which was insufficient therefor, and furnishing for such purposes an insufficient appliance. The evidence fits this allegation of negligence, and, if it goes further, shows *other negligence*, that is no ground for taking the case from the jury. It does go further, and shows other negligence in attempting an operation dangerous to the workmen inside, without giving them any warning. In so far as there was in this respect a variance between the evidence and the petition, if the defendant desired to take advantage of that, he should have objected at the trial, and then plaintiff could have amended his petition. The other assignment of error, which we shall now dispose of, is that the plaintiff's own negligence contributed to the injury which he suffered. This negligence, it will be perceived from what has been stated, consisted in his continuing at his work according to his contract of employment, in his customary place, in the absence of any warning or direction not to do so, and notwithstanding the fact that some injury or other had evidently happened to the building from what they were doing outside, under the reasonable assumption that they would not pull the building down over his head. No unavoidable inference of contributory negligence arises from this conduct.

The next assignment of error relates to the release set up by the defendant in his answer; and we shall first dispose of the question, in so far as it is a question of pleading. The first objection of the defendant, in respect of this release, is that it so far stands in the way

of the plaintiff's recovery that he cannot bring a direct action upon the cause of action thus released, without first bringing a suit in equity to set aside and cancel the release on the ground on which he now seeks to avoid it in his reply.    But counsel for the defendant concede that this suit in equity need not be a separate action, but that it can take the form of one of the counts in the petition in an action for damages, according to the precedent in *Blair v. Railroad*, 89 Mo. 334.    In other words, counsel for the defendant concede that the plaintiff could sue in equity in one count to set aside this release on the ground of fraud and undue influence, and in another count for damages at law for the injury for which he now sues ; but they argue that he cannot undertake to avoid the release by setting up in his reply that it was obtained by fraud or undue influence, as he seeks to do in this case. .

The proposition that a party, who has been induced by fraud or undue influence to release a right of action, cannot sue directly at law upon the right of action thus released, but must first proceed in equity to avoid and cancel the release, is not, and never has been, the law.    It is true that in *Blair v. Railroad*, 89 Mo. 383, there is this observation in the opinion of the court.    "The release being valid, it was necessary that its bar be removed by appropriate procedure in order to the successful prosecution of the action at law."    As the plaintiff in that case took the course indicated by the remark of the court, it was not necessary for the court to decide that it was necessary for her to do so.    The remark is, therefore, a mere *dictum*.    That it does not correctly express the law is shown by the statement of Mr. Chitty in his work on pleadings, where he says that, "to a plea of release, he ( the plaintiff) may reply *non est factum*, or that it was obtained by duress or fraud, and it is unnecessary and injudicious to state the particulars of the fraud."    1    Chitty on Pleading [16 Am. Ed. ] p. 608.    While the last

clause of this authoritative writer, that it is not necessary or judicious for the plaintiff in his reply to state the particulars of the fraud, was the rule of pleading at common law, yet it does not remain the rule of pleading under our code of procedure. In another place the same author gives the form of a reply of fraud, where the defendant had pleaded a release. 2 Chitty, 455. This rule of pleading was recognized in the opinions of the judges in *Wild v. Williams*, 6 Mees. & W. 490, where they refuse to strike out a plea *puis darrein continuance*, setting up a release, on affidavits showing that the release was obtained by fraud, holding that the plaintiff could contest the plea on that ground under a replication setting up the fraud. That the plaintiff may, in an action at law, reply fraud to a plea or answer setting up a release of the cause of action, was held by the supreme court of New Hampshire in *Webb v. Steele*, 13 N. H. 230, and in *Hoitt v. Holcomb*, 23 N. H. 535, and by the supreme court of Illinois in *Chicago, etc., Ry. Co. v. Lewis*, 109 Ill. 120, in both of which states the common-law system of pleading is understood to prevail. The same rule has been declared in Wisconsin (*Bussian v. Railroad*, 56 Wis. 325, 335), and inferentially in New York (*Dixon v. Railroad*, 100 N. Y. 170), in both of which states there is a system of code procedure similar to that which obtains with us. This court evidently took the same view of the question in *Vautrain v. Railroad*, 8 Mo. App. 538, though the opinion is not very distinct on the point; and it is to be added that that case was affirmed by the supreme court on appeal (78 Mo. 44), although without noticing the particular point. We, therefore, overrule this assignment of error. See, also, *O'Donnell v. Clinton*, 145 Mass. 461; *Peterson v. Railroad*, 38 Minn. 511; *Lusted v. Railroad*, 71 Wis. 391; *Ryan v. Gross*, 12 Atl. Rep. (Md.) 115.

The next assignment of error is, that there was not sufficient evidence of fraud or undue influence,

wrongfully exercised against the plaintiff, to warrant the court in submitting this issue to the jury. The defendant pleaded the release *in hæc verba*, and its execution was admitted by the plaintiff. This made a *prima facie* case for the defendant. To avoid this the plaintiff set up want of consideration and fraud. As the defendant's promise was in itself a sufficient consideration for the release, there was nothing which could be submitted to the jury on the question of consideration, except its adequacy, which still remained an element in determining the question of fraud and undue influence.

It is difficult to formulate a precise rule applicable to this class of cases. Releases of this class stand upon the footing of compromises, and should be upheld when fairly made. What evidence will suffice to set them aside is a question on which the courts have made very few attempts at definition. One court goes to the extent that, unless the evidence is clear and convincing and such as would warrant their being set aside in equity upon the *whole evidence*, they cannot be disturbed. *Railroad v. Shay*, 82 Pa. St. 198.

Considering the fact that the question is triable by jury, and that, under our mode of procedure, the credibility of the witnesses is always for the jury in the first instance, this view is not tenable, and does not meet with our approval. The just rule under our practice seems to be this: No release should be vacated, unless the plaintiff's evidence, if believed, and the circumstances attending its execution are such as would warrant a chancellor in setting it aside.

Stating the evidence with a view to the application of this rule, we find that it tends to prove that the injury which the plaintiff received was so severe as to render him unconscious for a time; that, as soon as an ambulance could be procured, he was removed to the city hospital, where his wounds were dressed; that on the following morning he was, at his own request, removed from the city hospital to his room in the city,

in a carriage which the defendant sent for that purpose; that on arriving at his room he did not go to bed, but placed himself in a chair and remained sitting up. At this point there is a missing link in the plaintiff's testimony, which must be supplied by the testimony adduced by the defendant. This link relates to the circumstances under which the release pleaded by the defendant was signed. That it was signed by the plaintiff is admitted by pleadings; but the plaintiff in his testimony professes to have no recollection whatever of signing it, or of being visited by the secretary and superintendent of the defendant on the occasion at which it was signed. According to the testimony adduced by the defendant he was, after being thus removed to his room, visited in his room first by the defendant's secretary. This was about one o'clock on the day after he was hurt. At this interview the plaintiff assented to an arrangement, such as that embodied in the release which the defendant has pleaded.

What took place at this first interview may be gathered from the testimony of Mr. Green, the defendant's secretary, which was to the effect that, on the morning after the accident, he had the plaintiff removed from the hospital to his own room, and that a little after one o'clock he went round to see him, and have a talk with him. He told the plaintiff that he had to go away to-morrow night to St. Paul, and that he would like to arrange this matter. He then made to the plaintiff the proposition for the settlement embodied in this agreement, and the plaintiff replied: "That seems fair enough. Q. What else? A. Well, that was about all, except that he asked me to send Frank Rosenberger up there."

The second interview took place about three o'clock in the afternoon of the same day, and Green then brought Wakefield, the superintendent, along with him to be a witness to the transaction. The plaintiff at this

second interview was again alone. At this time Rosenberger had not called upon the plaintiff. Mr. Green admits in his testimony that he thought that it was the proper thing to have the thing put through as quickly as possible—he thought that was for the plaintiff's interest, and for the company's. He claims to have been looking after the plaintiff's interest as well as that of the company. He took along Mr. Wakefield to witness the paper. He carried along a fountain pen with ink in it.

"*Q.* You had an idea you were going over there to get this fellow to release you from this trouble—isn't that it? *A.* Well, yes, to a certain degree. * * *

"*Q.* Why were you in such a hurry to get at him the next morning? *A.* Well, I don't know of any other reason *than that some attorney in our absence would get hold of him*, and persuade him to sue us and cause us trouble. * * *

"*Q.* Now, did you and Green confer about how you would work this thing? Did Green talk with you about how you would work it—get up this release and go over there before anybody talked with him, and get him to sign the release? *A.* Well, I do not recollect now. Well, I believe there was a remark that, *if people got to talking with him, that would change his mind.*"

The evidence delivered by the defendant's secretary also showed that he shortened the interview with the plaintiff as much as possible, because he had occasion to leave the city that evening on business, and because he regarded it as "business" so to shorten the interview. Evidence adduced by the plaintiff also showed that the plaintiff was in need of money at the time. According to the testimony of these two witnesses they found the plaintiff seated in a chair in his room apparently in an undisturbed mental condition. The secretary presented the paper to him to sign, and explained it to him; he examined it and signed it.

Plaintiff's testimony tends to show, when taken in connection with the testimony thus adduced by defendant, that he was in such a mental state when the release was signed that he could neither remember the visits of the persons who induced him to sign him, nor the fact of his having signed it; but he testifies that he found the paper lying on his floor some days afterwards. In addition to this testimony as to his mental condition, he called two witnesses. One of them, a fellow workman, testifies that he was sent by the defendant to visit the plaintiff on the day after he was hurt, at the plaintiff's room, and that while in the conversation which he had with the plaintiff the latter used proper language, and seemed to know and understand what he was talking about, yet he seemed to be bewildered—"his mind was not clear." Another witness, also a fellow workman, testifies that he visited the plaintiff at his room on the day following that on which the release was signed—that is, on Sunday, September 15, and that he found the plaintiff acting not rational; that is, his conduct was unusual, in that he seemed more good-humored and jovial than was customary for him. He did not seem to the witness to act or talk as he did before the accident. His manner was changed; his mind did not seem to be clear; he seemed a little mixed up.

On the other hand, the evidence of the defendant tended very clearly to show that the plaintiff was in good mental condition when he signed the release. This may be especially predicated of the evidence of the physician, whom the defendant employed to attend to the plaintiff.

In addition to these circumstances, the instrument itself contained this unusual clause: "He agrees to this deliberately, of his own free will, and without any undue influence from anyone." Unusual clauses of this kind in instruments, by which the draftsman of the instrument has obtained an advantage over the other

party to it, always excites suspicion of a fraudulent motive. It is said by Mr. Bump: "Anything out of the usual course of business is a sign of fraud. Unusual clauses in an instrument excite suspicion. *Clausulæ inconsuetæ semper inducunt suspicionem.*" Bump on Fraudulent Conveyances, p. 51. Quoting this maxim, it is said by our supreme court: "Whenever fraud is the matter in issue, any unusual clause in an instrument, any unusual method of transacting the business, apparently done with the view for effect, and to give to the transaction an air of honesty, is of itself a badge of fraud. For, 'when the part is overacted the delusion is broken, and the fiction appears.' *Comstalk v. Rayford*, 12 Smedes & Marsh, 369. This has been the rule ever since *Twyne's Case*, 3 Coke, 81, where it was held a circumstance of grave suspicion that a clause in the conveyance recited that the gift was made honestly, truly and *bona fide.*" *Baldwin v. Whitcomb*, 71 Mo. 651. The agents of the defendant, who procured the plaintiff to sign this instrument, entirely failed to explain why this clause was put in it, and the jury were, therefore, authorized to conclude that it was done with the motive of providing against the anticipated contest of the validity of the transaction.

We have here the image of a man, who has been badly hurt while in the service of a corporation, under circumstances which suggest that he has probable cause for an action for damages against them. He is hurt in three places, in the arm, in the back and in the head. He has had no surgical assistance, except such as the managers of the corporation have provided for him. He has not been informed of the probable extent of his injuries, and they presumptively know them, as far as a competent surgeon can make a prognosis. After being hurt he has been taken by them to the public hospital where his wounds have been dressed, after which he has been removed very kindly by them to his own room at his own request. Here, without any delay, beyond what

seems necessary to plan the transaction, and on the day immediately following the accident, he is visited by the secretary of the corporation, and the settlement under consideration is proposed to him.   He assents to it, but, at the same time, requests that they send Frank Rosenberger to him.   The evidence shows that the men engaged in the kind of work done by the plaintiff in the defendant's establishment worked in pairs, and that Rosenberger was the fellow workman with whom the plaintiff was paired in his work ; and the jury might fairly infer that he desired to consult his work-mate, Rosenberger, about so important a matter.   But the managers of the corporation take care to hurry up the consummation of the settlement before the plaintiff has an opportunity to consult Rosenberger or anyone else ; in point of fact, Rosenberger, though called in pursuance of the request which the plaintiff thus makes, does not arrive until after the agreement is signed.   They hurry it forward with the admitted purpose of bringing it to a conclusion before the plaintiff could have an opportunity of taking legal advice as to the nature and extent of his rights.   Soon after the interview at which he assents to the arrangement, and before he had had an opportunity to consult with anyone, the formal paper prepared by the officer of the defendant is brought to the plaintiff for his signature, by two officers of the defendant, one of them coming along as a witness to the transaction.   They find the plaintiff alone in his room, bolstered up in a chair, and suffering from his wounds. No doctor, except their own, has advised him as to the extent of his injuries.   Their diligence has been such that he has not had an opportunity to consult a lawyer, nor even his work-mate, Rosenberger, about the transaction.   But they are still in danger.   Some unlucky intruder may happen into the room before the paper is signed.   The defendant's secretary, who is its manager in the matter, shortens the interview by telling the plaintiff that he is obliged to leave the city on business, and

that he wishes the transaction closed before he goes. Under these circumstances, the plaintiff, alone, unadvised, suffering from his wounds, in need of money, and no doubt disturbed as to his future, and, according to the evidence adduced on his part, which the jury was entitled to believe, whatever we may think of its credit, in a disturbed mental condition, so much so that he does not remember the transaction—is induced to sign this paper, containing the unusual avowal before recited, by which, as it turns out, he relinquishes a very important right of action for a comparatively inconsiderable consideration.

These circumstances suggest the propriety of a judicial inquiry as to the fairness of the transaction. In the eye of justice, there is nothing sacred in a writing when procured by unfair means. We cannot adopt the view of the defendant that the foregoing facts afford no evidence to take the question of the fairness of this transaction to the jury. While such transactions will be upheld and enforced when fairly made (*Chicago, etc., Ry. Co. v. Lewis*, 109 Ill. 120), yet here the very circumstances tend to raise suspicions of the fairness of the transaction. Whether or not we should, if dealing with the whole evidence as chancellors, have taken a different view of it from that taken by the jury, we cannot hold that there was not sufficient evidence in support of the proposition of fraud and undue influence to take the question to them. Undoubtedly, to authorize a jury to set aside a written instrument on the issue of fraud, there must be substantial evidence which, if believed by the jury, tends to the conclusion of fraud. The legal presumption which springs from the execution of the writing is to be overcome; and it may be regarded as a sound rule, that the question of the validity of a release, as having been procured by fraud, ought not to be submitted to a jury where the evidence, giving to it its fullest effect in favor of the party sustaining the burden

of proof, is such that the instrument would not be vacated by a chancellor.

An.examination of a number of analogous cases, where written settlements have been set aside, either by chancellors or by juries, with the approbation of appellate courts, has tended to confirm us in this conclusion.

In *Evans v. Llewellin*, 1 Cox. Ch. 333, a deed was set aside as having been improvidently obtained for an inadequate consideration from persons in low circumstances, and unapprised of their right until the time of the transaction, though no misrepresentation or actual fraud whatever appeared to have been made use of. The master of the rolls said : "I am of opinion this agreement ought not to stand. I lay great stress upon the situation of the parties. to it, and the persons who compose the drama. The plaintiff was in mean circumstances, and totally ignorant of his rights until the moment of the transaction taking place. He was then at once told of his title to this estate, and at the same time came an offer of a large sum of money if he would relinquish it. The parties present were Mr. Llewellin, his friend, whom he brought to countenance the transaction, and Mr. Maddock, his solicitor. I must lay very great stress on Mr. Maddock's evidence ; for he told the plaintiff what was enough to influence any but a very firm man, that as he understood the defendant's great kindness to the family of the plaintiff, and as the sister's intention to give the estate to the defendant was clear, the plaintiff ought not in equity and conscience to take advantage of the blunder. I do not say that the consummation of an act, not in itself valid, will not in any case hold without an adequate consideration ; there certainly may be cases put in which such confirmation would be effectual, if proper time were allowed to the party and due caution used in making him aware of the consequences ; but here is a man destitute of money, and two hundred guineas are suddenly offered to him,

which, to a man in his circumstances, is a very impor-
tant sum, and he is then called upon to convey an
estate in prejudice of himself and his family for the
benefit of a person in affluent circumstances. It is said
he was cautioned by Mr. Maddock; it is true, and
so far the parties did right; but they ought to have gone
further; they should not have permitted the man to
have made the bargain without going to consult his
friends; there was not sufficient *locus penitentiæ;*
there was no person present to give him advice; he
was entirely in their hands, and surprised at this
unexpected acquisition of fortune."

Another case of a release obtained where the parties
were in grossly unequal circumstances is found in *Mitch-
ell v. Pratt*, Taney, 448, where a sailor, who was
at the same time paid off, signed a release of damages
for a grievous and unjustifiable assault and battery, in
consideration of the sum of twenty-five cents. Mr.
Chief Justice TANEY did not doubt that, "if this settle-
ment was fairly made, when the seaman was free from
improper influences, and had an opportunity of exercis-
ing his free and deliberate judgment, it ought to be
supported; but, in order to entitle it to support, it must,
in the language of the court in the case of *Cumber v.
Wane*, 1 Strange, 426, 'appear to be a reasonable satis-
faction, or at least the contrary must not appear.' And
in this view of the matter, it is of no importance whether
this paper be regarded as a release, or merely as a receipt;
for it certainly cannot be supported in either case, if it
appears to have been obtained unfairly, or by improper
influence." And the court, considering the inadequacy
of consideration, the graveness of the injury, and the
further fact that, although it was intended to discharge
the sailor there, the master had the power to compel
him, under the articles, to proceed to another port before
discharging him and paying him off, was of opinion
that the release was not fairly procured, and that it
ought not to stand.

In the case of *Peterson v. Chicago, etc., Ry. Co.*, 38 Minn. 511, a woman brought an action against a railroad company for damages for a personal injury. They pleaded a release, and she replied fraud in obtaining it. She recovered a verdict for $3,000, and on appeal the company assigned for error that the verdict was not justified by the evidence especially as to fraud in procuring the release. The court overruled this assignment in view of evidence to the effect that the defendant's agent had told the plaintiff, when he induced her to sign the release, that her physician had said that her injuries would soon be cured with proper treatment; and this although it appeared from the plaintiff's own testimony that she did not rely exclusively upon this statement in making the release, and although some detached portions of the plaintiff's testimony made it appear that she had ascertained its falsity before accepting the money. "But," said the court, "taking the whole of it together, we think it fairly and reasonably susceptible of the construction that, although her own opinion had been that she would never fully recover from her injuries, and that, notwithstanding the alleged opinion of her physician, she still had doubts about it, yet, in view of his supposed superior knowledge of her case, she so far relied upon his opinion, and was so far influenced by it, that it was the inducing cause of her signing the release."

In a case in the supreme court of Michigan, a settlement made for injuries made when the plaintiff was sick and in need of money for her family, and upon the statement made to her by the defendant's agent that to appear in court would be a disgrace, which settlement was repudiated by her the next day, and the money returned, was held no bar for a recovery for such injuries. *Stone v. Railroad*, 66 Mich. 76 ; s. c., 30 Am. & Eng. R. R. Cases, 600 ; 33 N. W. Rep. 24.

In *Bussian v. Railroad*, 56 Wis. 325, 334, the court held that a jury were justified, and that a chancellor

would have been justified also in setting aside a release of
damages obtained from a woman by an agent of the
defendant, after her action against the defendant had
been commenced, and without consulting her attorney.
The court, without imputing any intentional wrong to
the defendant or its agent, said : "We think that no
release, obtained from the plaintiff after an action has
been commenced and counsel employed, in the absence
of the plaintiff's counsel, and without his consent or
knowledge, should bind the party unless the utmost
good faith is shown on the part of the defendant in
obtaining the same. When a party has employed an
attorney to procure an action, such attorney ought to be
consulted if a compromise of such action be sought, and
ordinarily it would be bad faith on the part of the client
and the opposite party to compromise the action without
the consent of, or without consulting, such attorney."
In the case last cited the court cited and quoted from
its previous decision in *Watkins v. Brant*, 46 Wis. 419,
as laying down a doctrine quite appropriate to the case
under consideration. In that case a settlement was
made between two sisters in regard to their rights to
certain real estate. The settlement was made in the
presence of the attorney of the elder sister, the attorney
of the younger not being present. The court condemned
the transaction in strong language, and set the settle-
ment aside. "No transaction" said the court "should
ever be consummated, as it were *ex parte*, in a lawyer's
office."

In *Lusted v. Railroad*, 71 Wis. 391, the plaintiff,
while sick in bed, and suffering from such injuries as to
affect his sight and render him dizzy, signed a sealed
release of his claims against the defendant for loss or
damage and personal injuries caused by a railroad
collision. It was held that a jury were warranted in
finding that the release was procured through a
mistake, and was not binding upon him, since the cir-
cumstances of its execution did not disclose such

negligence in not knowing its contents as to preclude him from showing that, in fact, he did not have such knowledge,—and this, although no actual fraud was perpetrated upon him. The court laid stress upon the fact that the jury found in answer to special questions that the release of damages for the personal injuries was not talked about at the time when the release was signed. In fact, the supreme court of Wisconsin hold that one, who signs an alleged discharge or acquittance without knowing its contents, is not bound by it. *Butler v. Regents*, 32 Wis. 124; *Schultz v. Railroad*, 44 Wis. 638, 645. To the same effect is *Chicago, etc., Ry. Co. v. Lewis*, 109 Ill. 120, 130; *Illinois, etc., Ry. Co. v. Welch*, 52 Ill. 182.

In *Blair v. Railroad*, 89 Mo. 383, the action was by a married woman against a railroad company for personal injuries received in a railway accident, and there was a count in the petition in the nature of a bill in equity in which she sought to set aside a written instrument in which she had released her right of action in consideration of the payment of $30, averring that it had been procured from her through fraud, in ignorance of the extent of her injuries and of her legal rights in the premises. The evidence upon this issue is not stated, but the following observations of Mr. Justice SHER- WOOD, have some pertinency to the case before us : "There can be no doubt that there was evidence justify- ing the conclusion which the circuit court reached, that mistake and misapprehension existed on the part of Mrs. Blair when she signed the release ; she evidently did not think that she was seriously injured, nor did defendant's agents, or, if they did, their conduct smacks of fraud in inducing her to sign a paper relinquishing rights not in contemplation of the parties at the time. It is most evident that the only compensation she received was for her loss of time, a paltry sum, and yet the release recites and embraces full satisfaction for all damages for personal injuries, loss of time, and expense

resulting from the accident. The doctrine is firmly rooted in equity that when an instrument is so general in its terms as to release the rights of a party of which he was ignorant, and which were not in contemplation of the bargain at the time it was made, the instrument will be restrained to the purposes of the bargain, and the release confined to the right intended to be released."

Error is next assigned upon the giving of the following instruction at the request of the plaintiff: "1. The court instructs the jury that, if the plaintiff signed the paper release read in evidence at the instance of the defendant's agents, and without knowing its, contents, and that he did never assent to the terms of release, then said release is no defense to this action."

The objection urged against this instruction is, that it omits the element that the plaintiff received and retained benefits under the contract of release, which is an undisputed fact under the testimony. These benefits, we understand, consisted of the attendance of a physician procured by the defendant for a month subsequent to the accident, for which the defendant paid the physician $50; and also the payment to the plaintiff of his wages for the portion of the month of September that elapsed subsequently to the date of the accident. The jury, in their verdict, gave the defendant a credit of $62 for these benefits.

It is not the law that a party who has been induced by the fraud of the other party, to release his right of action against the latter, must restore the consideration which he has received for the giving of the release, in order to be entitled to set up the fraud in avoidance of the release in an action upon the cause of action thus released. *Chicago, etc., Ry. Co v. Lewis,* 109 Ill. 120. It is true, as a general proposition of law, that one, who is induced by fraud to enter into a contract with another, must, within a reasonable time after discovering the fraud, notify the other party of its rescission and restore to him whatever consideration he

has received under it.  But he is not bound to restore to the other party what he has received under it, where the other party is indebted to him in a larger amount.

It is also a general principle of law that where a party, who has been induced by the fraud of another to enter into a contract with that other, discovers the fraud, but, nevertheless, after discovering the fraud, accepts benefits from the other party under the contract, he thereby affirms the contract and precludes himself from disaffirming it.  There was probably evidence which would have authorized the court to submit that question to the jury ; but the failure of the court to embody that hypothesis in this instruction was at best mere non-direction which could have been supplied on the application of the defendant by requesting the proper instruction.

This instruction is, however, faulty in a particular in which it has not been challenged by the defendant. It is not the law that the mere failure of a party to a contract, who labors under no disability or infirmity, through his own fault or neglect to read or inform himself of it as to its contents, is sufficient to annul or overcome its legal effect as to him.  *Gwin v. Waggoner*, 98 Mo. 315.  But the jury could only understand the instruction in the light of the pleadings and the evidence ; and other instructions fully explained to them that the failure of the plaintiff to understand the contents of the instrument, which would avoid it, must have proceeded from his mental infirmity at the time.

It is next assigned for error that the court gave the following instruction at the request of the plaintiff : ''2.   If the jury find from the evidence in this case that the paper release read in evidence was signed by the plaintiff when he was in a mental condition such that he could not comprehend or understand its contents; and if the jury further believe from the evidence that defendant's agents, Green and Wakefield, took advantage of plaintiff's said condition to induce him to sign

said paper, and that said agents, owing to plaintiff's said mental condition, induced plaintiff to sign said paper without understanding its contents, intending thereby to defraud the plaintiff out of his cause of action set forth in the petition, then said paper release is no defense to this action."

The objection which is urged to this instruction is, that it omits the element of knowledge, on the part of the defendant, that the plaintiff was of infirm mind at the time when the negotiations for this release were had. It is argued that the plaintiff in his reply does not seek to avoid the release upon the mere ground, that he was of unsound mind at the time when he executed it, but that his reply sets up the ground of avoidance of the release that the defendant had defrauded and cheated him into signing it, by knowingly taking advantage of his enfeebled condition. This is not a correct statement of the reply. It proceeds on both grounds. It avers "that he was at said time not of contracting mind, and was unable, through his bodily and mental condition, to understand or comprehend the contents of said agreement, and did never assent to the terms thereof." So far as omitting the element of knowledge on the part of the defendant is concerned, this instruction is not open to that objection; for it charges substantially in the language of the reply that the defendant's agent "*took advantage* of the plaintiff's said condition to induce him to sign said paper." This language implies the *scienter* which is necessary to constitute fraud in fact. We, therefore, overrule this assignment of error.

Error is next assigned upon the giving of the following instruction at the request of the plaintiff: "5. If the jury find from the evidence that plaintiff was in the service of the defendant on the thirteenth day of September, 1889, as a molder; and if the jury further find from the evidence, that on said day, while plaintiff was in the discharge of the duty of his said employment at

defendant's shop, a piece of timber, being a part of said shop, fell upon and injured the plaintiff ; and if the jury further believe from the evidence, that said piece of timber was caused to so fall upon and injure the plaintiff by reason of a strain or displacement of said shop, caused by the lifting of the heavy iron yoke mentioned in the evidence ; and if the jury further find from the evidence that one Wakefield was superintendent for defendant, and by it authorized to control said work, and the laborers doing same, as to the manner of doing said work, and if the jury further find from the evidence that said Wakefield did not use ordinary care in causing said yoke to be lifted by the crane, supported as it was at the time in the manner it was lifted, owing to its weight, and that thereby said timber was caused to fall upon and injure the plaintiff ; and if the jury further find from the evidence that plaintiff, at the time of and just preceding his injury, was exercising ordinary care, then plaintiff is entitled to recover, provided the jury further find, under the evidence and instructions, that the plaintiff did not agree to the paper release read in evidence as defined in the other instructions.''

We find ourselves unable to comprehend the objection which is made to this instruction. That objection, as stated at the outset of defendant's argument, is that the instruction ''allows a conclusion of negligence to be inferred from the single fact that the timber fell because of an undue strain on the supports of the crane.'' It does not seem to us to be subject to this criticism. It predicates the plaintiff's right of recovery, not on the mere fact that the timber fell because of an undue strain on the supports of the crane, but on the hypothesis that Wakefield, the defendant's superintendent, did not use ordinary care in causing the yoke to be lifted by the crane, supported as it was at the time, in the manner it was lifted owing to its weight, and that thereby the timber was caused to fall upon and injure the plaintiff.

There was in the plaintiff's evidence abundant material for this hypothesis.

Another objection to this instruction, that it predicates the plaintiff's right of recovery upon the acts of the defendant's superintendent Wakefield, in endeavoring to *raise* the yoke with the crane, whereas, in point of fact, the catastrophe was produced by his endeavoring to *let it down*, is too refined for the practical purposes of justice. The defendant's foreman of laborers commenced to raise the yoke in obedience to the orders of the superintendent Wakefield, and, when he had got it partly raised, the guy attaching the crane to the corner of the building broke loose from its fastenings. Then the foreman of laborers started to lower the yoke, but the superintendent, fearing that that would cause greater strain to the building, ordered him to desist, and to chock it, which he did. Then, after the lapse of the interval already stated, the superintendent determined to try to swing it around, with the intention of getting it down ; and while they were thus bringing it around the catastrophe which hurt the plaintiff happened. It would be a great refinement to hold this instruction erroneous, in the sense of being prejudicial, on the mere ground that it predicates the negligence of the defendant upon a want of ordinary care in attempting to raise the weight, when in fact the negligence, if any, consisted in the want of ordinary care in attempting to get it down after it had been partly raised, and could not safely be raised any further. The accident took place in consequence of what was done or omitted in the general attempt to raise the weight with what proved to be an unsafe and insufficient appliance ; and this statement is sufficient to show that there was no prejudicial error in the instruction.

The next assignments of error are predicated upon the refusing of certain instructions tendered by the defendant. Concerning these assignments of error we have to observe that there were but three issues in the case : *First*. The negligence of the defendant.

*Second.* The contributory negligence of the plaintiff. *Third.* The validity of the release. The defendant, nevertheless, tendered *seventeen* instructions, of which the court gave *twelve.* As we have often observed, following the views of the supreme court, the court might properly have refused them all, by reason of their number alone. Such a number of instructions is well calculated to confuse and embarrass, rather than enlighten and assist, an ordinary jury.

We shall nevertheless examine those which were refused. One of these instructions was as follows: "13. The court instructs the jury that, if you find and believe from the evidence that defendant's officers, superintendent and foreman failed to notify and warn plaintiff of the apprehended danger from the falling of the crane, whereby plaintiff was injured, that is not an act of neglect on part of the defendant for which you can hold it liable in this case."

The instruction in this form was refused, but the court modified it by adding thereto the following words: "Unless you further find that the foreman of defendant was negligent in attempting to raise so heavy a weight as said iron yoke with said crane, fastened and secured as it was, as defined in other instructions."

So that the said instruction as modified by the court and given to the jury was as follows: "The court instructs the jury that, if you find and believe from the evidence that defendant's officers, superintendent and foreman failed to notify and warn plaintiff of the apprehended danger from the falling of the crane, whereby plaintiff was injured, this is not an act of neglect on the part of defendant for which you can hold it liable in this case, unless you further find that the foreman of defendant was negligent in attempting to raise so heavy a weight as said iron yoke with said crane fastened and secured as it was, as defined in other instructions."

The instruction might well have been refused entirely, because it was erroneous in point of law and as applied to the evidence in the case. On the defendant's evidence alone, the giving of this instruction would have been gross error. That evidence showed that, after the first catastrophe, the building continued to crack and that defendant's superintendent was apprehensive that it might fall at any time. Nevertheless, in this state of things, he determined, instead of putting supports under the weight and getting it down that way, as ordinary prudence would suggest, to undertake to swing it around so as to lessen the strain on the building, knowing that the commencement of this motion would probably increase the strain on the building. He looked inside and saw no workmen within thirty feet of the wall, and, therefore, concluded that it was not necessary to warn them that he was about to do this, forgetting that they might at any moment, not apprehensive of danger, return to their work in the place of danger. To charge that, under these circumstances, it was not an act of neglect on the part of the defendant to fail to warn the plaintiff of the danger would have been a gross error.

But it is argued that there was no obligation to give such a warning to the plaintiff, because he knew all about it. The answer is that this instruction does not relate to the contributory negligence of the plaintiff, but relates to the negligence of the defendant. The plaintiff knew that something had happened to the building. The building was a "shell," made of framework covered with corrugated iron. One of the rods connecting the crane and the building had pulled loose, making considerable noise and scattering dust. The plaintiff probably knew that, though, according to his own testimony, he continued at his work. He did not have a knowledge of the danger in the sense in which the defendant's superintendent had such a knowledge. Especially he did not know that the superintendent

was going to do anything which would increase the danger, or which would probably pull the building down over his head. He was a molder, and presumably not a mechanical engineer, and there is no presumption of law that he understood that he was in a place of special danger; and the law will not impute blame to him for continuing at his work, according to his duty to his employer, under the natural supposition that his employer would not pull the building down over his head. The giving of this instruction, as thus modified, was a ruling favorable to the defendant. It had the effect of telling the jury that it was not negligence not to warn the plaintiff, provided that it was not negligence for the defendant's foreman to do what he was about to do.

Error is next assigned on the refusal of the following instruction: "16. Before the jury can find a verdict for the plaintiff, they must be satisfied from the evidence of all of the following facts:

"*First.* That the injury to the plaintiff was caused by the fall of a timber loosened and caused to fall by defendant's action in undertaking to raise with a certain crane on its premises a greater weight than said crane with its fastenings was capable of carrying.

"*Second.* That the injury complained of was the direct and immediate result of defendant's act in undertaking to raise with said crane a greater weight than what it and its fastenings would bear.

"*Third.* That defendant, or its superintendent or foreman, knew that said crane and its fastenings would not bear the weight they were undertaking to lift with it, or might, by the exercise of ordinary care and diligence, have ascertained such fact.

"*Fourth.* That plaintiff, after the fastenings or guy rod spoken of in the evidence had given way, used proper care and diligence to avoid the injury which he sustained.

"*Fifth.* That the plaintiff could not, by the exercise of such care, as is above indicated, have avoided the injury which he suffered.

"If the jury find against the plaintiff upon any one of the foregoing propositions, their verdict must be for the defendant."

In addition to what we have already said about the number of instructions tendered by the defendant, we observe that we do not see but that all the hypotheses contained in this instruction were adequately covered by the instructions which the court gave at the request of the plaintiff and the defendant, seventeen in all. Indeed, the jury seem to have been too much instructed in this case.

Error is also assigned upon the refusal of the following instruction   "17. If the jury believe from the evidence that the plaintiff signed the paper, termed a release, given in evidence, and that the defendant thereby undertook to furnish and pay for all the medical attendance necessary for plaintiff's recovery from the injury sustained by him ; that defendant, in accordance with its said undertaking, did procure Dr. Dalton, to attend and treat the plaintiff for his said injury; and that plaintiff accepted the services of Dr. Dalton, and remained under his treatment about four or five weeks, and that defendant has paid said physician, then they will find for the defendant."

We see no error in refusing this instruction. We have already indicated our view as to the proper element of an instruction upon this hypothesis. This instruction is bad, because it leaves out the hypothesis, that the plaintiff accepted the services of Dr. Dalton *with knowledge* that he had been employed by the defendant to treat him in pursuance of the contract of release. Plaintiff's evidence is consistent with the conclusion that, as soon as he discovered the nature of the contract which he had signed, which discovery was on the fifteenth of October, he repudiated it, and

discharged Dr. Dalton as his physician. According to his testimony, he collected pay from the defendant twice. The first time was in September on the Wednesday or Thursday after his injury. At that time he got what he had made in August. Then he went back again in October, about the fifteenth of the month, which was the next pay day. At that time he got what he had earned in September, $24.75. He testifies that he never got anything more.

The next assignment of error is that the damages are excessive. This is plainly untenable. Considering the amount of damages awarded by juries in cases of this kind which are every day affirmed, this award cannot be regarded as excessive. Nor is there, in the manner in which the jury made the award, evidence of prejudice. They returned a verdict for the plaintiff, awarding him damages in the sum $1,562 less the sum of $62 paid by the defendant under the terms of the release given in evidence. In cases of this kind there is no rule of law prescribing a measure of damages, but the jury are remitted to giving a round sum under all the circumstances of the case; and the verdict which they returned, and the manner in which they returned it, clearly indicate a purpose on their party to give the plaintiff the round sum of $1,500 under all the circumstances of the case, and after deducting what the defendant had laid out in his behalf.

Judgment is accordingly affirmed. The other judges concur.

ROMBAUER, P. J.—We continued the motion for rehearing in this case to await the final ruling of the supreme court in *Mateer v. Railroad*, which case involves propositions similar to the one at bar. That case has since been decided (16 S. W. Rep. 839), and the opinion filed therein has been carefully examined. That case impliedly concedes that the validity of releases of this character may be tried upon answer and

reply in actions at law, and that the rules governing the trial of the question are in such event in main the rules applicable to trials at law. In so holding the decision is in harmony with our ruling in this case. We concede that there is something incongruous in the proposition, that the character and extent of the evidence required to vacate a written contract should be dependent upon the fact, whether the proceeding is one at law or in equity, and thus enable a plaintiff, by giving him the choice of the tribunal, to vacate a written contract *at law*, upon evidence which would be insufficient had he proceeded *in equity*. This incongruity, however, necessarily arises in every case wherein the jurisdiction at law and in equity are concurrent, at least in those states whose courts like ours adhere to the proposition, that in actions at law the credibility of witnesses is a question for the jury.

While we are aware that it is difficult to reconcile the *reasoning* of the supreme court in the case of *Vautrain v. Railroad*, 78 Mo. 44, and *Mateer v. Railroad*, *supra*, with its reasoning in the case of *Blair v. Railroad*, 89 Mo. 383, and to reconcile the reasoning in either of these cases with ours in the present case, the majority of this court are of the opinion that there is nothing in the *decision* of either of those cases, which makes it a *controlling decision* opposed to the result arrived at in the case at bar. The motion for rehearing must, therefore, be overruled. All the members of the court concur in the view that the case raises propositions of pleading and evidence which should be set finally at rest by some controlling decision of the supreme court, and, as Judge BIGGS is of opinion that the case is one which, within the purview of the constitution, should be certified to the supreme court, it is ordered that it be so certified, and that all further proceedings therein be stayed until the final decision of that court.

Girard v. The St. Louis Car-Wheel Co.

SEPARATE OPINION, ON MOTION FOR REHEARING.

BIGGS, J.—A re-examination of this case, on the motion for rehearing, has led me to the conclusion that the judgment of the circuit court ought to be reversed. The effect of our opinion is to hold that a contract may be rescinded in an action at law. This, I do not think can be done. Where the execution of a contract is admitted, a court of law can only recognize and enforce its legal effect. If one of the contracting parties wishes, by judicial action, to be released from it, he must apply to a court of equity. Where, however, a contract has been obtained by fraud, it is permissible for the defrauded party, on his own motion, without the aid of any court, to rescind it, if he acts promptly after the discovery of the fraud. But, in order to make the rescission complete, he must return, or offer to return, whatever of value he may have received on account of such contract. There is an exception to this general rule where an unquestioned claim has been compromised by the payment of a smaller sum. But this case does not come within the exception, because the original liability was a matter of controversy. In the present action it is admitted, or at least the jury so found, that the plaintiff received under the contract about $10 in money and medical attendance furnished by the defendant of the value of $50. Until these amounts were returned, or offered to be returned, to the defendant, the plaintiff's *contract of compromise stood as a legal bar to the prosecution of his original cause of action.* If the money *had* been returned, then the plaintiff could have proceeded with his action, upon the theory that the contract had been rescinded, and his plea of fraud in the reply could then have been supplemented and supported by his act of avoidance or rescission, which in my opinion was absolutely necessary to make the plea good. Courts of law may try such an issue on the theory that

the right of rescission has been exercised by the plaintiff, and, if it is developed on the trial that such right was available, the rights of the parties would then be determined as if the contract had never existed. In this way a court of law may make effective previous acts of rescission, but in doing so it cannot be said that the court annulled or canceled the contract.

What has been said is supported by the supreme court of New York ( *Gould v. Bank*, 86 N. Y 75; *Cobb v. Hatfield*, 46 N. Y. 533 ); the supreme court of Georgia ( *East Tenn., etc., Ry. Co. v. Hayes*, 10 S. E. Rep. 350 ); the supreme court of Massachusetts ( *Thayer v. Turner*, 8 Metc. 550; *Kimball v. Cunningham*, 4 Mass. 502 ); the supreme court of Illinois ( *Doane v. Lockwood*, 115 Ill. 490; *Moriarty v. Stofferan*, 89 Ill. 528 ); the supreme court of New Hampshire ( *Pierce v. Wood*, 3 Foster, 519 ); and Bigelow on Fraud, sections 74, 75.

The case of *East Tenn., etc., Ry. Co. v. Hayes*, *supra*, was exactly like the case at bar. There had been a compromise settlement, and the railroad company had paid Hayes $100. The company interposed the compromise agreement in bar of the action, and Hayes replied that it was obtained by fraud. The sole question in the case was, whether Hayes could recover on his original cause of action, unless it appeared that he had returned, or offered to return, the money before the commencement of the suit. The court, in a well-considered opinion, held that a return of the money before the commencement of his action was a condition precedent to the right to maintain it. It was said: " While fraud may vitiate or avoid all contracts, the contract is nevertheless not void, but voidable only, at the instance of the person defrauded. He who perpetrates the fraud cannot avoid the same, or vitiate it, on account of his own conduct. It may be a good contract until it is avoided by the action or at the instance of him who is defrauded. * * * Something must be

done by the party defrauded before the contract can cease to bind. When that something has been done, and the engagement has been terminated, the contract is said to have been rescinded, and the process by which this result is effected is called rescission. A contract may be rescinded, out of court, at the instance of the party defrauded, where an agreement has been made, and something of value has been received by the defrauded party, whether vendor or purchaser it matters not. This must, before suit, be tendered back to the wrong-doer in the name of rescission, with demand of return of what the wrong-doer has received. The object of the tender is to effect a restoration of the *status quo*, and in this class of cases it is a condition precedent to rescission.''

The case of *Gould v. Bank, supra*, is also a similar case to the one under consideration. In that case the supreme court of New York collected and commented on all the reported cases, and, in a very exhaustive and satisfactory opinion, came to the conclusion that, where there had been a compromise of a cause of action and anything of value had been paid on account of it, a suit could not be based on the matters thus settled, unless the contract had been previously rescinded by the judgment of a court, or by the plaintiff returning or offering to return whatever of value he received under the contract. The court said: '' The compromise agreement, unless annulled, is an *absolute bar* to the action. It is a general rule laid down in the text-books and reported cases, that a party who seeks to rescind a contract into which he has been induced to enter by fraud must restore to the other party whatever he has obtained by virtue of the contract. *Cobb v. Hatfield*, 46 N. Y. 533. He cannot retain anything he received under the contract and yet proceed in disaffirmance thereof. * * * But the claim of the plaintiff is that because it was finally determined by the court that the sum paid the plaintiff and much more was due him from the bank,

the fact that he did not return the money furnished no defense to the action. It is believed, that this claim, under the circumstances of this case, has no sound basis of principle or authority to rest on." Further on in the opinion the court said : " The difference between an action to rescind a contract and one brought, not to rescind it, but based upon the theory that it has already been rescinded, is as broad as a gulf. They depend upon different principles and require different judgments."

It would serve no good purpose to quote further from the authorities cited. An examination of them will show that, where a matter in dispute has been compromised, and an action is based on the original relations between the parties, the plaintiff must show that, previous to the commencement of the action, he rescinded the contract of settlement by placing his adversary *in statu quo*, that is by paying back to him the consideration of the contract. The contrary to this seems to me to be illogical, unless a contract obtained by fraud is void *ab initio*. If this rule be adopted, then neither party would be bound, which is contrary to the great weight of authority. Such a contract is absolutely binding on the party practicing the fraud, and it is only voidable at the instance of the party defrauded. It cannot be said that 'a contract is absolutely binding on one party, and absolutely void as to the other.

I find nothing in the decisions of our own court which are opposed to the views herein expressed. In the case of *Vautrain v. Railroad*, 78 Mo. 44, the plaintiff denied that he received any money or anything else of value in settlement of his action.

In *Blair v. Railroad*, 89 Mo. 383, there was an equitable count which was first tried by the court, and in this trial the compromise agreement was set aside, and the plaintiff ordered to deposit in court the amount received by her under the compromise. When an action for rescission is brought in a court of equity, it

is only necessary for the plaintiff in his petition to offer to return or restore to the defendant what he has received. *Allerton v. Allerton*, 50 N. Y. 670.

In *Mateer v. Railroad*, 16 S. W. Rep. 839, the plaintiff, as in the *Vautrain case*, denied that he had received anything by way of compensation for the injuries received. I, therefore, conclude that the circuit court committed error in refusing the defendant's seventeenth instruction.

On other branches of the case I agree with my associates, but it seemed to me that our reasoning was so much opposed to that of the supreme court in some of the cases cited that the case ought to be certified. In fact I think that our decision on the *quantum* of evidence necessary to sustain the issue of fraud, or other ground of rescission, is opposed to the decision of the supreme court in the *Vautrain case*.