ELLEN S. STONE v. THE CHICAGO & WEST MICHIGAN RAIL-
WAY COMPANY.

*Evidence—Expert testimony—Settlement of claim for injury—Fraud.*

1. Expert testimony, based upon the testimony of a witness which is rejected by the jury, is of no value.

2. Scientific *opinions* are worthless when pitted against facts. The theories of medical men are not always reasonable, and are never to be regarded when they manifestly conflict with established facts.

3. After the commencement of a suit by a married woman against a railroad company for injuries sustained through its negligence, defendant's station agent, assisted by a physician, who was also a lawyer, induced her uncle to interview her regarding a settlement, who, as she testified, told her that it would be a great disgrace for her to be brought into court, and if she carried on the suit it would be " put off and put off," and she would get nothing in the end. Her husband was absent at the time, and her children were sick, and she was thus induced to agree to settle her claim. Soon after this the station agent and lawyer visited her, and a receipt was read to her in full for all demands against the railroad company, which she signed, receiving $8 in money and a due-bill for $32, which she returned the next day, and repudiated the settlement. She further testified that she had no money in the house to buy medicine for the children, whose sickness was uppermost in her mind, and that she thought if she could get the money offered by the company she could get the medicine. Her testimony on this branch of the case was not disputed.

*Held,* that the misrepresentations of the uncle were those of the defendant, whose agency must be reco gnized if the settlement is insisted upon, he being employed because of his relationship to and influence over the plaintiff; that advantage was taken of plaintiff's loneliness, poverty, and sickness to secure such settlement; and that, in such cases, courts should not hesitate to speak plainly, and give relief.

*Held,* further, that the defendant cannot complain of the action of the court in submitting the facts to the jury, who were instructed that if plaintiff was induced to make the settlement by reason of wanting money to buy medicines for her children, and made it understandingly, and without fraud or undue influence

upon the part of those acting for the defendant inducing such settlement, it was binding on the plaintiff, and a bar to the action.

Error to Ottawa.   (Arnold, J.)   Argued April 21, 1887. Decided May 5, 1887.

Case.   Defendant brings error.  Affirmed.   The facts are stated in the opinion.

*Smith, Nims, Hoyt & Erwin,* for appellant.

*George A. Farr,* for plaintiff.

MORSE, J.   On the ninth day of January, 1883, the plaintiff, then pregnant, was a passenger upon defendant's road.   She resided at Bushkill, a station on said road, in the county of Ottawa.   She testifies that she was about six months advanced in her pregnancy, and had been that day, with other ladies, to West Olive to do some trading.   ,When the train reached Bushkill on her return, she was sitting towards the rear end of the car.   The ladies with her, being in the front end, got off before she did.   She passed through the car, and upon the front platform of the same, to alight.   She had a market basket with groceries in one hand, and a broom in the other.   The brakeman reached up and took hold of her hand, and about the time he did so the train started up.   She stepped no further; but the starting of the train, combined with the pulling of the brakeman, jerked her off the car upon the ground upon her knees in the snow.

She testified, further, upon cross-examination, that she had stepped down upon the first step before the brakeman took hold of her hand, and that she first struck upon her feet, and then fell upon her knees.   She felt nothing, at the time of falling, except a "wrench in her back."   She got up and went to the house, and claims that it hurt her from that time until the next morning.

"Then it kind of died away, and I supposed it was all right; that it would come back no more; and it went on that day, and all that night, until Wednesday morning; and Mr. Stone was at home then, and he asked me if I was able for him to go away, and I told him, yes, I was all right. I felt nothing then, and he went to Johnsville. He had been gone some half an hour, I guess, when my pains returned again, and I was taken with flowing, and at 10 o'clock a miscarriage took place."

It was claimed by the plaintiff that the fall from the car was occasioned by the negligence of the defendant in not stopping its train for a sufficient length of time to allow her to descend in safety, and the sudden starting of the cars while with due care she was attempting to alight therefrom, and that the miscarriage was the result of such fall, and therefore the defendant was liable in damages therefor.

. It does not seem to be seriously disputed by the defendant but that the fall, such as it was, was the result of the defendant's negligence, and without the fault of the plaintiff. But it is strenuously contended that the miscarriage could not be the result of the fall, and that the evidence shows beyond cavil that the *fœtus* was dead before the accident. The company also relied upon a settlement made by its agents with the plaintiff.

The plaintiff brought suit in the circuit court for Ottawa county, and upon the second trial of the cause recovered a judgment in the sum of $500. The errors assigned in this Court all relate to the charge of the circuit judge to the jury.

The counsel for the defendant requested the court to direct a verdict in favor of the company. This was refused. They also requested an instruction that—

" The medical expert testimony shows that the condition of the *fœtus* at the time of delivery, as described by the witness Mrs. Peck, it being delivered in the unbroken sack on Wednesday, and being partly macerated, and having on it discolored spots, was such that death must have ensued prior to

the accident of Monday, and that the death of said *fœtus* was not occasioned by said accident."

This instruction was also refused.

The defendant further assigns error on the following portions of the charge:

"3. If, however, the jury find from the evidence that the plaintiff had been left alone for several days with three small children,—one a baby, who had been sick for several days,— and that the plaintiff had been obliged to watch for several nights prior to the settlement, by reason of the sickness of her babe, and that upon the day of the settlement the plaintiff was suffering from headache, and was so suffering at the time of the alleged settlement, and that the defendant, acting through Harris acting for it, by his statements to her, made and effected a settlement, induced her to believe that it would be disgraceful to appear in court in such matters, or that she would be disgraced if she did appear in court, and that she would get nothing in the end; and if, from her condition at the time, she was unable to decide intelligently for herself, or believed such statement, and was induced thereby to make the settlement, and would not have made it without, —you have the right to consider these matters; and if the plaintiff did not in fact give her consent to the settlement from her incapacity to consent, or was induced to consent by the misrepresentations of the defendant's agents, knowingly made and knowingly false on their part, and made to induce the plaintiff to settle, you would be justified in finding that the settlement was not the voluntary act of the plaintiff, and not binding upon her.

"4. And if you find from the facts that the settlement was at once repudiated, and the money and due-bill returned, it will constitute no bar to this action.

"5. In short, that evidence preponderates in a given case which produces conviction of its truth upon the minds of the jury over and above all evidence opposing that upon the same point. In this case you are to take into consideration the testimony of the plaintiff, the circumstances as detailed by her; you are also to take into consideration the testimony on the part of the defendant, the testimony of the physicians; and if, from the whole testimony in the case, you are satisfied by a preponderance of evidence that this miscarriage was the result of the negligent act of the defendant, and that that was occasioned without any negligence upon the part of the

plaintiff in the case, then she would be entitled to recover, so far as this branch of the case is concerned; that is, entitled to recover for that injury."

In support of the two request of defendant, its counsel contend in this Court—

1. There was no evidence from which it could be found that the death of the *fœtus*, and subsequent suffering and miscarriage by the plaintiff, were the result of the accident. in question.

2. That the evidence of the plaintiff shows that she settled with the defendant because she was sick and in straitened circumstances, and wanted the money for the necessities of herself and children, and for no other reason, and that such settlement was voluntary, and without fraud upon the part of the defendant, and is binding upon her.

The second request was rightly refused, for the reason that neither the evidence of Mrs. Peck, nor any other person who saw the child after its delivery, disclosed any *maceration* of the *fœtus*. Indeed, the contrary was shown by all the testimony.

The errors alleged are really all embraced in the two propositions contended for by the defendant's counsel, and may probably be disposed of in the discussion of said propositions.

*First.* There was conflicting evidence as to the appearance of the *fœtus*, and the jury were the sole judges which statement was true. Mrs. Peck testified that she acted as midwife at the time of plaintiff's miscarriage. She says:

"The child looked just as natural as any child could look,— a baby that had been miscarried. It was natural in every way, excepting two spots where it showed a little blue on one shoulder and on its hip. Otherwise the child was perfectly natural. There was no decaying about it; and if I used the word 'mortified' before [referring to a former trial], I did it without knowing what I meant. I did not intend to use such word, because it was not mortified."

Mrs. Melvin, a witness for the defendant, testified that she was at the house of Mrs. Stone after it was born. The child

was in a common-sized cigar box.  She could not tell what day it was, but thought it was the eleventh of January, 1883.

"It was dry, and there were some black spots on it, on its shoulders and its body, and its eyes were sunk in its head."

On cross-examination she said:

"I did not take up the child.  *  *  *  These discolored parts were on its back and shoulders.  *  *  *  Mrs. Peck handed it to me, and showed it to me in the box.  I did not take it in the box.  She just held it in the box.  I did not take it out.  She did not take it out of the box.  It was lying in the box face up.  It was not dressed.  It had nothing on."

The trouble with the expert evidence in this case is that so much of it as was based upon the testimony of Mrs. Melvin was useless unless the jury believed her testimony; and the jury had a perfect right to reject her testimony, and accept that of Mrs. Peck.  Upon the testimony of Mrs. Peck, Dr. Smart, one of the experts, simply gave his opinion that he should not think it possible that the death of the child was caused by the accident.  And Dr. Johnson, the other expert, testified that from the evidence of Mrs. Peck he believed that death must have existed before the accident, and gave as a reason that putrefaction would not set in in so short a time, because the sack enclosing the child was not broken, and without the access of atmosphereic air putrefaction never occurred; the waters must break before it would take place; but that, if the child was dead for a long space of time without the sack being broken, a state of decomposition would come.

"The child becomes macerated and discolored, but it is not the black green of mortification; it is a dark and reddish discoloration, which differs from putrefaction.  If the air were admitted to that child, it would putrify and swell, and there would be a green discoloration ; but in the waters, with the air entirely excluded, you have simply a maceration of the *fœtus*, with the discoloration; and that I take it is the condition these ladies have described, and that process is

66 MICH.—6.

very slow.     Putrefaction is rapid, but that process of discoloration and maceration is very slow."

Thus Dr. Johnson's opinions were either based upon the testimony of Mrs. Melvin, or upon a state of facts assumed by him, and which came from the testimony of no witness sworn in the case.    The opinions of these two experts were mainly valueless, unless Mrs. Melvin was believed.

Upon the testimony of Mrs. Peck the jury had Dr. Smart's opinion that the child was not alive at the time of the accident, against the positive testimony of the mother, who testified that she felt its motion upon Monday.

Scientific opinions are worthless when pitted against facts. The theories of medical men are not always reasonable, and are never to be regarded when they manifestly conflict with established facts.    To lessen the force of Mrs. Stone's testimony that she felt the motion of the child, the experts testified that women sometimes imagined such things, and that cases had been known where in imagination they passed through the successive stages of pregnancy almost up to the point of delivery, when there had been no pregnancy at all. But such cases must be exceptional, and rarely to be found even in the domain of scientific research, while such occasions are most assuredly wanting from the knowledge and experience of the common lot of mankind.    And I think the jury might well be excused from taking credence in this story of the imagination, as applied to the statement of Mrs. Stone in this case.    If they believed her, they were authorized to discard the theories of the physicians, and rest upon her knowledge of the life within her womb.

*Second.* In relation to the alleged settlement, I think the question was fairly and properly submitted to the jury.

Two years and four months after the accident, and after suit had been long commenced, the station agent of the defendant at Johnsville and one Bishop, a lawyer and a physician, effected a settlement with her, and took a receipt from her.    Before

going to see her, they induced or employed her uncle, one Harris, who was living with Bishop, to talk with her, and prevail upon her to settle. He told her, so she testifies, that it would be a great disgrace for her to be brought up in court; that it was "not nice" for a woman with a lot of children; if she carried the suit on, it could be "put off and put off," and she would get nothing in the end. She believed what he said. At the time, her husband was away, and she was alone with her little children, one of whom was a baby and sick. She was also sick, and had stayed up so much nights with the sick child that she was nervous and excited. She says, further:

"I was not in my right mind at the time,—not what I was before. I was sick the six weeks after, on account of being up nights, and having sick children to take care of, and my baby two months old. * * * I was excited, and was not capable of hardly knowing what I did do."

A few hours after Harris had persuaded her to settle, Bishop and Bacon appeared on the scene with a receipt for all demands against the company drawn up for her signature. It was read to her, but she says all she knew as to what it contained was her name and the Chicago & West Michigan railroad. The total sum to be paid her was $40. They gave her eight dollars in money, and told her that they would send the balance of the money to her, or she could come to Johnsville, eight miles, and get it. Bacon gave her his due-bill for the $32. The next day she returned the money and the due-bill, and renounced the settlement. She testified that she would not have made the settlement had she not believed what Harris told her,—that it would be a disgrace for her to go into court. She also testified:

"I had had no experience whatever, and that, and my being sick, and having no money to buy medicine for my children, was what influenced me to sign that paper. If I had not been sick myself, and had had time for an afterthought, I would not have done so. The statement of Mr.

Harris made me believe that it would be a disgrace to come into court. I did not want to come. I supposed he would influence me rightly, and that influenced me. He said, if I carried the suit on in court, it would be put off and put off, and I would get nothing in the end.

"*Q.* Did you suppose, at the time, that he told you the truth about it being a disgrace to appear?

"*A.* Yes, sir; I knew nothing about courts or law whatever, and I supposed he did."

She also testified, in response to a question how long another child had been sick:

"Oh, only just a short time; but there was no money in the house to get any medicines with, and I had no way of getting any, and my thoughts were, if I could get this money I could get medicine for my children. The children being sick was the most that I thought of. I thought of nothing else then except to help them."

Mr. Harris, Bacon, and Bishop did not contradict her, and were not offered as witnesses.

The misrepresentations of Harris were the misrepresentations of the defendant. If the company insists upon the settlement, it must recognize his agency. Advantage was taken of the loneliness, poverty, and sickness of the plaintiff to make a settlement with her for a pitiful and insignificant sum. Her ignorance was also played upon by one in whom she relied and whom she trusted. He was employed because of his relationship and influence over her. There can be no doubt but the woman was imposed upon and wronged, and courts should not hesitate, in such cases, to speak plainly, and give relief.

The defendant cannot complain of the action of the court below. The jury were instructed in its behalf:

"If she was induced to make the settlement by reason of wanting money to buy medicines for her children, and made it understandingly, and without fraud or undue influence upon the part of those acting for the defendant inducing such settlement, then the settlement is binding upon her, and a bar to this action."

There was therefore no error in submitting the facts in this case to the jury. Their verdict upon the merits was against the defendant, and the judgment entered thereon in the court below must be affirmed, with costs.

The other Justices concurred.