## J. R. OWENS, Appellant, v. NORWOOD-WHITE COAL COMPANY, Appellee.

**MASTER AND SERVANT:** Mine Entry—Failure to Timber. A mine owner may not say that he was free from negligence, when he knew that the roof in a mine entry was liable to become loose and fall at any time, and failed to timber it.

**NEGLIGENCE:** Contributory Negligence—Injury in Mine Entry. A miner, injured by a fall of rock in an entry, may not be said to be guilty of negligence, when the place of injury was not his usual place of work, when he was present at said place under orders of his superior, did not know of the dangerous condition there existing, and was charged with no duty with reference to said place.

**MASTER AND SERVANT:** Relative Duties of Miner and Mine Owner. A mine owner must timber the mine *entries*. The miner must timber his *working place*.

**MASTER AND SERVANT:** Assumption of Risk—Unknown Danger. One may not be held to have assumed a danger of which he was ignorant.

**RELEASE:** Validity—Mistaken or Fraudulent Statements. A jury question on the issue whether a release of damages was void is manifestly presented by evidence tending to show that it was obtained for a grossly inadequate consideration, at a time when the plaintiff, an uneducated and inexperienced man, was enfeebled in body and mind, and by mistaken *or* fraudulent statements, to the effect, among other things, that plaintiff was not permanently injured, had no broken bones, and would be at work in a short time.

**APPEAL AND ERROR:** Law of Case—Different Record. The law as to any point in the case, as declared by the court on one appeal, is the law of the case on a subsequent trial or appeal, *provided the record is the same.*

RELEASE:    Evidence—Physical and Mental Condition.    Evidence
7   of the mental and physical condition of an injured party is
admissible on the issue whether a release of damages was pro-
cured by fraud *or* mistake.

EVIDENCE:    Opinion Evidence—Inability to Maintain Action.    A
8   statement by one who was negotiating for a release of damages
"that he was a lawyer of experience, and that the injured party
would not be able to maintain an action for his damages,"
made for the purpose of being acted upon by the injured party,
is, in legal effect, a statement of fact.

EVIDENCE:    Opinion Evidence—Fraudulent Purpose.    An opinion
9   given for the deliberate purpose of deceiving another may be
treated as a statement of fact.

*Appeal from Polk District Court.*—THOMAS J. GUTHRIE,
Judge.

DECEMBER 13, 1919.

REHEARING DENIED APRIL 13, 1920.

ACTION at law, to recover damages on account of per-
sonal injuries.    At the conclusion of the evidence on the
part of plaintiff, the court sustained a motion by defendant
for a directed verdict in its favor, and plaintiff appeals.—
*Reversed.*

*John L. Gillespie,* for appellant.

*Miller, Parker, Riley & Stewart, C. Woodbridge,* and
*E. D. Perry,* for appellee.

WEAVER, J.—The injury for which plaintiff seeks to
recover damages was sustained August 5, 1908, and this suit
was begun in April, 1909.    The case has twice before been
brought to this court upon appeal.    See
*Owens v. Norwood-White Coal Co.,* 157
Iowa 389, 181 Iowa 948.    It is, therefore,
unnecessary for us to restate the issues.
Concerning the facts, the following are not the subject of

dispute. Plaintiff is a coal miner by occupation, and, on the day in question, was, and for some time had been, employed in the defendant's mine. In the course of such service, he was assisting the defendant's timberman in the unloading of timbers from a coal car in one of the entries of the mine, and, while he was so engaged, a large mass of slate fell upon him from the roof, or from the angle between the roof and the side of the entry, injuring him very severely. He was carried to his home, but within a few hours was taken to a hospital, where he remained about four days, when he was returned home. While at the hospital, he was visited by Mr. Woodbridge, defendant's attorney and claim agent, and the physician Dr. Cokenower, who treated him. On the day following his return home, he was again approached by the agent, soliciting a settlement of his claim, if any, for damages. This visit was repeated at least once, and perhaps twice, and the negotiations so begun ended in the execution by plaintiff of a written release of the defendant from all claims for damages on account of his injury, in consideration of which Woodbridge, acting for the defendant, paid plaintiff the sum of $50 in money; also the further amount of $16.60, to cover his expenses at the hospital; and the company also paid for the services of Dr. Cokenower. Plaintiff admitted giving the release, but pleads in avoidance that it was obtained from him by fraud and mistake.

As we have already indicated, the first trial resulted in a judgment for the plaintiff, and it was from this adjudication that the first appeal was taken. After an opinion affirming the judgment had been filed, a rehearing was granted, and a reversal was ordered because of errors in the charge of the trial court to the jury, and because of the view of a majority of the court that the evidence was insufficient to sustain the plaintiff's plea of fraud, in avoidance of the release which he had executed. As that view

was decisive of the appeal, there was no discussion of the evidence relating to the alleged negligence of the defendant, except that a majority was "inclined to think" that no actionable negligence was shown, and "inclined to the opinion" that there had been an assumption of the risk; but neither proposition was adjudicated, and this is explained by the court, when it there designates the issue upon the release as the "controlling proposition in the case." It is also to be said that, while much of the testimony on these issues is a repetition of that which was given on the first trial, the record as a whole indicates that plaintiff's showing was, in several respects, materially strengthened on the second trial, and that there is nothing in the former opinion which prevents us from passing upon the merits of the case, as they are revealed by the evidence given upon the last hearing.

Following that decision, a procedendo issued from this court, and the plaintiff had the cause docketed for a new trial in the court below. The defendant objected to further trial, and moved the court for judgment in its favor on the record, on the ground that the issues had been determined and finally adjudicated by this court on the first appeal. The trial court adopted this view of the situation, refused to allow a new trial, and entered judgment against the plaintiff for costs. On appeal by the plaintiff to this court, the ruling was reversed (see *Owens v. Norwood-White Coal Co.,* 181 Iowa 948), and the cause was again remanded for trial.

On the second trial, the plaintiff having introduced his evidence and rested, the defendant, without offering or introducing any testimony in its behalf, moved for a directed verdict in its favor. The grounds of such motion, though stated in 22 different forms or paragraphs, may be abridged as follows:

1. That the binding and conclusive character of the

written release of defendant from liability precludes further inquiry into the merits of the case.

2. That, as a matter of law, there is no evidence to support a finding of negligence on the part of defendant.

3. That the negligence complained of was that of a fellow servant.

4. That the evidence shows conclusively that the plaintiff had assumed the risk.

The court sustained the motion, and directed a verdict for defendant, saying that, in its view, plaintiff had failed to show any actionable negligence; but that, in entering the ruling of record, it would be made to show the motion sustained on all its grounds, "so that all questions presented to the trial court may be raised and finally decided on all grounds."

It will readily be seen that, notwithstanding the multiplicity of the formal points made by appellee in support of the ruling on the motion, the disposition of this appeal must depend, for the most part at least, upon our answer to the two questions: First, Was the evidence of defendant's alleged negligence sufficient to take the case to the jury upon that issue? and, second, Was there evidence for consideration by the jury in support of plaintiff's plea in avoidance of the release executed by him? To these issues we now turn our attention.

I. Could the jury, under the evidence, have found defendant negligent, as charged, with reference to its maintenance and care of the entry where plaintiff was hurt? The accident occurred in an entry known in the record as "17 East." Plaintiff's regular employment was that of pump man in another part of the mine; but he had had considerable experience in other forms of mining work, and, on occasion, when his service at the pump would permit, he engaged in other labor, as he might be directed or requested. Entry 17 East had been driven to a point 60 feet be-

yond the place where plaintiff was injured, which was in front of Room No. 7, worked by a miner named Murray. It was the duty of the mine owner or operator to take care of the roofs of the entries, and this duty was performed by a timberman employed for that purpose. The timberman having Entry 17 East in charge was one Grange, who is a witness in this case. As the character of the roof was variable, it was not at all points protected by timbers, those portions in which the overlying rock was found to be of a kind not likely to break or fall being left without such protection; but daily inspections were made, or should have been made, of all exposed roofs, and, upon the appearance of any dangerous condition, timbers were put in, or the loosened rock taken down. In completing 17 East, a portion of the roof near Room No. 7 and a short distance on either side was left without support, on the theory that the rock was safe. On the day in question, the timberman Grange was proposing to timber a section of the roof of 17 East, some 30 or 40 feet to the east of Room 7, and asked plaintiff to assist him. Together they came into the entry, with a load of timbers on a coal car, and, stopping in front of Room 7, began to unload the car, when a large mass of slate fell upon the plaintiff, and caused the injury complained of.

Passing, for the present, the question of contributory negligence by plaintiff, let us inquire what, if anything, is shown from which the jury could find want of proper care on part of the company, with respect to the defect in the roof and the fall of the rock. As we have said, it is the conceded duty of the owner or operator of a mine to keep the entries in proper condition, and use reasonable care to see that the roof is protected, if protection is needed. The company was, of course, not an insurer, but it was bound to exercise reasonable care to maintain the entry as a reasonably safe way for those whose duties led them to use it. To

be reasonable, the care to guard and protect must be fairly proportioned to the nature and extent of the perils to be apprehended. It is the universal testimony of miners that the danger of injury such as plaintiff sustained is both great and constant; that frequent inspection of entry roofs is necessary, for the protection of those using the passageways below; and that, whenever any portion of a rock roof becomes loose or threatening, it should be taken down, or the place should be timbered.

Grange admits that it was his duty to make these inspections every day, and says he did it. He further admits that his attention had been attracted to the overhanging rock which fell upon plaintiff. He says:

"I had been watching that roof every morning, and sounding it. It was what might be called an ugly looking piece of roof. If it had not been for the danger of Jim Murray shooting the timbering out with his shot, I might have timbered that place; but I was busy, and could not get at it. A place is always considered safe when it is solid, and that place was solid that morning. * * * The only reason that piece was not taken down before August 5th was that it remained solid. But even if it was solid that morning, sometime or other it was going to get loose. I looked for it to get loose, sooner or later. I looked for it to be loose every morning."

If there be any doubt whether such evidence was sufficient to take to the jury the question of due care, it disappears when we look to the testimony of other witnesses. Murray, who worked in Room 7, and passed under this piece of roof frequently every day, and who assisted in lifting the plaintiff from the place where the rock struck him down, testifies that he had noticed the threatening appearance of this mass of slate many times, and had reported it to the mine foreman and to the superintendent. He says:

"I told them where the place was, and that was the

place which fell on Mr. Owens. The same piece of slate which fell on Mr. Owens. * * * Before it fell, I had examined it, and it was loose."

Another miner says the roof had been in that condition for a month, and he had called Grange's attention to it. Still another witness, who, until about 5 days before the accident, had been the mine foreman, whose duties called him into and through Entry 17 East every day, speaking of the same place, says:

"I had noticed the condition of the entry in front of Murray's room, and it was not timbered. * * * We had slate down there in front of Murray's room several times. By that, I mean there had been falls,—that is, slips,— pieces fell out. * * * Before I left there, the roof was slippy and rolly, but, as far as being loose, I could not say; but it did not look very good. It should have been timbered. * * * I saw the piece of roof up over the switch points which went into Murray's room. It was a piece of slate that hung down alongside the road, and hung over the roadway; and if that was loose, it was liable to get loose any time; but, of course, if it was solid, it was all right. If it got loose, it was apt to catch somebody. * * * That entry should have been timbered. * * * It could have been timbered before I left, and it should have been timbered a week or two before I left, I suppose."

That this showing by the plaintiff was sufficient to take to the jury the question of defendant's negligence with respect to this roof, is so clear as to render argument on that point superfluous. Defendant's suggestion that the negligence, if any, was that of a fellow servant, is without merit, for the obvious reason that the keeping of the roof in reasonably safe condition was a magisterial duty, and Grange, according to his own showing, was, in this respect, a vice principal. It is further argued that, even if this be true, it appears that Grange had inspected the roof that morn-

ing, and found it solid; hence, there was no negligence. But, in view of the testimony of other witnesses, the jury might very properly find that, if Grange did inspect the place, it was not done with proper care or attention.

The defendant contends, however,—and there is evidence tending to show,—that, a short time before this accident, a quantity of slate had fallen or had been taken down at this same point; and it is argued that the witnesses above quoted are speaking of the condition of the roof before that change or repair was made. But no such interpretation can be placed upon the testimony of several of the witnesses, and especially that of Murray, who was present and helped lift the rock from plaintiff's body, and who says, in so many words, that the overhanging mass whose threatening appearance and looseness he had noticed, and of which he had complained to the timberman and company officers, "was the same piece which fell on Owens." If there be any room for question or doubt at this point, its answer depends upon the veracity of the witnesses and the weight and value of their testimony; and this is the function of the jury, and not of the court.

Nor is there any sound basis in the evidence for contending, as a matter of law, that plaintiff is chargeable with contributory negligence. The point where he was injured was not his usual place of work, nor was it the place of the timbering in constructing which he was to act as helper to Grange, nor in a place where, by his own labor, he was creating the dangerous conditions of which he now complains. The united testimony of all the witnesses connected with the mine is that it was not his duty, nor was he expected to care for the roof of the entry at that place. He was under the command of the timberman, whose duty it was to make daily inspection of the entry, and plaintiff was entitled to place at least some de-

2. NEGLIGENCE: contributory negligence: injury in mine entry.

gree of reliance upon the assumption that such duty had been performed.

It is a matter of common knowledge, as is illustrated in nearly every mining case coming before the courts of this state, that the organization and duties of workmen in coal mines are, to a very great extent, defined by

**3. MASTER AND SERVANT: relative duties of miner and mine owner.** customs and rules which are the outgrowth of long experience, and have come to be recognized and observed as the law of the mine, by both miners and operators. Among them, none is better established than that which, while requiring the miner to prop or otherwise protect the roof of his own room or other place where, by his own excavation, he is removing the natural support of the overlying rock, imposes upon the owner or operator the duty to make reasonably safe the entries by which communication between the shaft and the various rooms is maintained, and passage is afforded for miners and laborers moving from place to place, in discharge of the tasks assigned to them.

The witness Grange, who is by no means hostile toward the defendant, says the custom was for the company to take care of the entry to a point about 15 feet from the face—a point which, in this instance, would be considerably to the east of the rock fall in front of Room 7; and that miners, daymen, and drivers, in using the entry, "would rely upon the company's having taken care of the roof of the entry. It was not customary for miners or teamsters or the like to sound the roof in the entry, or to inspect the roof. It was the custom for all of them to depend upon the company keeping the entries safe." Speaking of the time and place of the accident, Grange says:

"Owens had no pick, that I saw, and he did not stop and sound the roof. It was not his duty, nor was it necessary for him to do that."

Carey, the mine foreman, having 30 years' experience in Iowa mines, says:

"No employee about the mine, other than the timber-man, had anything to do with the roofs of the entries, and the timberman would go through the entries in the morning and inspect the roof; later on, the miners would go through to their various places of work. And they have nothing to do with inspecting or looking after the roof, as they pass through the entries. * * * The duties of detecting faults, slips, flaws, and dangerous places in the roofs of entries is not the same with timbermen and their help. It was Grange's duty to look after that, and it would not be any of the business or duty of the helper."

There is other testimony to the same effect, but enough has been recited to demonstrate that the question of contributory negligence was also one for the jury; and, in so far as the trial court's ruling is based upon the opposite conclusion, it is manifestly erroneous. What we have here said upon the question of contributory negligence is pertinent, also, to the defendant's plea of assumed risk. There is nothing in the evidence tending to show that plaintiff knew of the defect in the roof, or that, in the exercise of reasonable care, he ought to have known it. The plea of assumed risk is an affirmative defense, and the burden of establishing it is on the defendant.

4. MASTER AND SERVANT: assumption of risk: unknown danger.

II. The other inquiry, whether plaintiff made a case for the jury upon his plea in avoidance of the release, is perhaps more debatable, though the proper answer is hardly less certain.

5. RELEASE: validity: mistaken or fraudulent statements.

Prior to his injury, plaintiff was a man in good health, a miner of experience, and was earning $2.56 per day. He was a married man, dependent upon the earnings of his daily labor for the support of himself and family. The rock which fell up-

on him was about 8 feet long, and from 1½ to 2½ feet in thickness. In addition to the external bruises and injuries thus resulting to him, plaintiff sustained an "impacted fracture" of the "neck of the left femur," by which phrase, as we understand it, is meant that the head of the thigh or large bone of the leg was broken off near the hip joint. A large blood tumor was also produced, beneath the skin and bruised muscles. "It was," says the physician, "a deeply seated injury to the blood vessels in the small of the back." Except by what the experts call a "fibrous union," the broken bone has never healed or knitted, and plaintiff is badly and permanently crippled.

The physician does not seem to have discovered the most serious injury, the breaking of the thigh at or near the hip socket, or, if he did discover it, he did not so inform the plaintiff, nor did plaintiff know of this condition until after he had executed the release. His injury had rendered him physically helpless, and he was still in bed, suffering much pain, when the settlement was made.

There is much of doubt, if not something of mystery, as to the exact relation of the physician to the parties. It is undisputed that Dr. Cokenower treated the plaintiff until a short time after the release was executed. He says he was called into the case by telephone, but is unable to say from whom the call came. The plaintiff and his wife say he was called by neither of them, nor at their request or direction; that he was not, at that time, their family physician, a sick member of their family being at that time under the care of another physician. Plaintiff further says that, in one of his interviews with the defendant's claim agent, the latter, speaking of the physician, said, "Dr. Cokenower does our doctoring." The claim agent and the physician were together at the hospital where plaintiff was first taken for treatment. Whether they went there together is not stated, but it does appear that they there discussed plain-

tiff's condition. After plaintiff's return to his home, the claim agent and physician together went to plaintiff's home at least once, and the physician thinks they made such joint visit twice. So far as shown, the physician did not, in anything said by him to the plaintiff, urge or advise a settlement, or compromise plaintiff's claim for damages. It does appear, however, that, on such occasion, Woodbridge, the agent, sought and urged a settlement, and, while this was being discussed, the doctor waited in the carriage outside. Plaintiff's evidence is to the effect that, in thus urging a settlement, Woodbridge, after quoting the alleged opinion of the doctor that the injury was temporary only, went out to the carriage, where the doctor was waiting to talk with him and verify the statement made as to plaintiff's condition. Coming back to the sick room, Woodbridge reported that the doctor had just said plaintiff had no broken bones. and no very serious or permanent injuries. Plaintiff further testifies that Woodbridge advised him not to go to any lawyer about the matter, and said that he needed no lawyer, for the company would do what was right with him; that defendant was willing to pay him $75, all told, but he (Woodbridge) would assume to do better than that, and would pay him $50, and, in addition thereto, would take care of plaintiff's hospital expenses and of the doctor's fees.

Concerning the latter fees, the agent told plaintiff that the doctor was charging $5.00 per visit, and that, for the treatment already had, and the few visits which might still be necessary, his bill would be nearly $100. He further stated, according to plaintiff, that he, Woodbridge, was himself a lawyer, having considerable experience in that line; that he had looked into the facts in this case; and that plaintiff had no cause of action; and that, if plaintiff brought suit, the company would refuse to treat with him at all, and would defeat him in the end.

Plaintiff further says that he was impressed with the

friendly attitude of Woodbridge, who promised to do everything in his power to help him, and to try and get the company to pay him half wages while disabled; that he believed and relied upon Woodbridge's statements, and that Dr. Cokenower had said what Woodbridge had reported him as saying; and, being so induced, and being further pressed and influenced by his necessitous condition and the needs of his family, he finally consented to accept the settlement so offered him, and executed the paper or release prepared and presented to him by Woodbridge, without reading it or hearing it read.

It further appears that plaintiff has been a miner from boyhood, having very little education and little business experience, supporting himself and family on his daily earnings; that, at the time he executed the release, he was still suffering much pain, and, because of his pain and weak and nervous condition, he was unable to obtain normal sleep or rest.

Dr. Cokenower, as a witness on the trial, denies that he told Woodbridge plaintiff had no broken bones and no serious injuries, or that he would be able to return to work in six weeks, or that he was charging plaintiff $5.00 a trip for his services. He admits that he said to Woodbridge, at the hospital, that, so far "as the blood tumor was concerned, it would heal in about six weeks, but as far as the hip was concerned, I did not know. * * * I never at any time told Woodbridge I was charging Owens $5.00 a trip from my office to his house. I charged $2.00 per trip. During the conversation at Owens' house, nothing was said by me about Owens' getting back and at his work in six weeks. I did not, in any conversation with Woodbridge, tell him that, in substance."

It is also to be said that the doctor admits that defendant paid for his services; and, on the other hand, it is to be conceded that this fact, while consistent with plaintiff's

theory that the physician was employed by defendant, is not necessarily inconsistent with the other proposition, that such payment was made only in consideration of the release. The doctor himself denies that, in treating the plaintiff, he was acting in the employ or service of the defendant or of Woodbridge.

As we have before said, the evidence as to the real relation of the physician to these parties is by no means satisfactory; but we think a jury could properly infer from tho testimony that, even if Dr. Cokenower was not in any way representing the defendant's interests, he was at least exercising care to avoid placing any obstacle in the way of Woodbridge's securing a settlement with plaintiff on the most favorable terms possible. The most which need here be said is that, upon the record as made, it cannot be said, as a matter of law, that Dr. Cokenower was the representative or agent of the plaintiff in whatever statements he, in fact, made to Woodbridge.

The foregoing, while not including all the evidence, is sufficient to indicate the substance and general nature of plaintiff's showing in support of his claims that, in the transaction which resulted in the execution of the release, he was not dealing on equal footing with the defendant, and that undue advantage was taken of his weak and enfeebled condition and of his ignorance and lack of experience, to secure his signature to the instrument for a grossly inadequate consideration.

Cases of this class are frequently before the courts, and the general rule is well settled that such a release by an injured servant in favor of his employer will be set aside as void, when shown to have been obtained by fraud.

In proceeding to consider how far, if at all, the rule is applicable to the facts of the case before us, we notice, at the outset, appellee's claim that the question is settled by

the opinion of this court upon the first appeal, which, it is argued, has become the law of the case. It is to be said, however, that, while the former opinion does announce its conclusion that, upon the evidence as contained in that record, the charge of fraud, as there submitted to the jury, had not been established, and while such finding would be controlling of this appeal, if it were being taken upon the same record or upon the same state of facts, it does not deprive the trial court of authority to hear and try the issues of fact anew, or of this court to pass upon the question whether, on the record as made on the second trial, plaintiff was entitled to submit his case to the jury. To hold otherwise would be to say that defendant's motion for judgment after the first reversal was properly sustained, and that this court erred in holding otherwise, and in directing that a new trial be had. The very purpose of the order for a new trial was to afford the plaintiff an opportunity to supply, if he could, any deficiency in his evidence, and to avoid, so far as he might be able, any other defects appearing in that record. The testimony of the alleged fraud or mistake in the settlement as produced in the second trial is more definite and certain than on the first hearing and is not open to the objection that its consideration is precluded by our former opinion.

In this connection, it is quite important to note that the inquiry and the issue of fraud upon the former trial were restricted within a very narrow compass. In the first place, the plaintiff's claim and evidence to the effect that Woodbridge told him he was a lawyer, and experienced in such cases, and had examined into the circumstances of plaintiff's injury, and that plaintiff had no cause of action against the company, and, if he brought suit, the company would surely defeat him, were all taken out of the case by the charge of the trial court to the jury (see 157 Iowa 408,

6. APPEAL AND ERROR: law of case: different record.

409) ; and, according to the view of this court, the cause had been submitted to the jury on two propositions only: the mental incapacity of the plaintiff, and the alleged misrepresentation of Woodbridge, concerning the time in which plaintiff might reasonably expect to recover from his injuries. This charge to the jury was held to be erroneous, first, because there was no evidence to support a finding that plaintiff was mentally incapacitated—though it is there added that, "had the jury been directed to consider plaintiff's mental condition in arriving at the effect which Woodbridge's statement as to the time when he might expect to recover had upon him, there might be some ground for sustaining it." The other fact issue which the trial court had left in the case was said to be "the representations as to the time within which plaintiff would recover," and of this, a majority of the court held the evidence insufficient.

The reversal upon that appeal and the order for new trial leave all these questions of fact an open field for investigation; and, as we have already said, it was the duty of the trial court, and, upon appeal, becomes the duty of this court, to say whether, in its judgment, the evidence now presented should have been submitted to the jury.

It is an elementary proposition that the law favors settlements, fairly obtained, of disputed claims. It is no less true that contracts of settlement may be vitiated by fraud or inequitable advantage by either party thereto. To hold otherwise is to offer a premium for the encouragement of fraud and inequitable advantage, which it is the true mission of the courts to prevent. In considering a claim or allegation of fraud in such cases, the court will inquire, not alone into alleged false or deceitful or misleading representations, but into the circumstances attending the transaction, tending to show whether the parties were dealing at arm's length, and upon equal footing. This is especially

true where the settlement sought to be impeached is one between an employer and an injured employee, made at a time when the employee is still suffering from his injury, and it is alleged that advantage of his weakness, physical, mental, or both, was taken by the employer, to obtain from him a release of his damages upon payment of a grossly inadequate consideration.  The reports contain the history of many cases in which the circumstances are not altogether unlike the one at bar, in which the claim is made' that a servant has been deceived or misled by the employer as to the nature and extent of his injuries.  In many instances, releases alleged to have been so obtained have been adjudged void, while, in many others, the evidence of fraud has been held insufficient; but it is universally held that, if the evidence be sufficient to justify a fair-minded juror in the conclusion that the servant so situated was imposed upon or deceived by the act of the employer, or of those representing the employer, and that, but for such imposition, the release would not have been executed, then the court cannot properly direct a verdict against the servant.  It is the contention of the appellee in this case that the alleged statements made by Woodbridge to plaintiff, even if made as claimed, were mere expressions of his opinion, and not representations of fact on which plaintiff was justified in placing any reliance.

Without deciding, by any means, that expressions of opinion by the employer or its agent may not, in some cases, and under some circumstances, be evidence of fraud or fraudulent purpose, we will pass without further consideration all those alleged statements by Woodbridge which may fairly be said to be a mere statement of his private opinion as to the plaintiff's injuries, and confine our attention to those which may not be thus classified.  Among the things shown in the plaintiff's evidence in this respect is to be found the following: that, as we have already said, when

Woodbridge was soliciting plaintiff for the release, and try-ing to persuade him that his injury was not serious or per-manent, he went out to the carriage to see the doctor, with the ostensible purpose of ascertaining the doctor's opinion in the matter, and then, returning, told the plaintiff that the doctor said plaintiff had "no permanent injuries, no broken bones, and that he would be able to return to work in six weeks." He is also alleged to have reported to plain-tiff that the doctor was charging him for treatment $5.00 per trip, and that, with two or three additional trips which would probably be required, his bill would be about $100. These statements, if made, cannot be said to be an expres-sion of the personal opinion of Woodbridge, but were of matters of material fact, and the law applicable thereto is found clearly stated on the last page of our former opinion (157 Iowa 412) as follows:

"Woodbridge was not a doctor, and was not undertak-ing to give his own opinion, but was attempting to repeat a statement said to have been made to him by plaintiff's own physician; and, if he falsely and fraudulently misrepre-sented what the doctor said to him, and plaintiff believed his statements to be true, and acted thereon, this would amount to such a fraud as would nullify the receipt and settlement."

Now, the doctor, as a witness, distinctly denies having made either of the statements so attributed to him, and tes-tifies that his mention of a period of six weeks was express-ly limited to the period required for the healing of the blood tumor. He says:

"I told him the tissues of the back, the *haematoma* (blood tumor), ought to heal up in about six weeks, with-out any after effects; but, so far as the hip joint was con-cerned, I did not know."

This, by no liberality of construction can be made the equivalent of a statement that there are "no broken bones,

no permanent injury," and that plaintiff would be "out of bed and back to work within six weeks;" and, upon the rule of law above quoted from the former opinion, and sustained by numerous authorities, some of which are hereinafter cited, the foregoing testimony, which stands undisputed in this record, quite obviously is for the consideration of the jury.

Quite in point is *Haigh v. White Way Laundry Co.*, 164 Iowa 143, a recent case decided by this court. There, the plaintiff, while in defendant's service, sustained a severe injury to her hand, and thereafter defendant obtained from her a written release of her claim for damages, at a small consideration. Later, she brought suit, and was permitted to avoid the settlement, upon a showing that she was misled by the representations of the employer and its agents. These representations were to the effect that her hurt was trifling; that the tendons of her hand were not injured; and that she would soon recover therefrom, and be as well as ever. The court, stating that an expression of an honest opinion could not constitute a fraud, proceeds to say that, while the expression of an opinion as to the length of time required for plaintiff to recover from her injuries necessarily partakes of speculation, and an "honest opinion upon that subject given upon that matter would not constitute fraud," yet the representation that the injury was trifling, and the tendons of the hand were not injured, were "substantive facts," and their assertion, as an inducement to obtain a settlement, had direct bearing upon and relation to the extent of the defendant's liability to the plaintiff. If this be a correct proposition, as we think it is, it must be true in this case that a statement to the plaintiff that his injury had resulted in no broken bones, and was not of a permanent character, when, in truth, he had sustained a broken thigh or hip, one of the most serious fractures which the human frame can suffer, were representa-

tions of very important "substantive facts," and manifest-
ly, if believed and relied upon by the plaintiff, they misled
him to his serious disadvantage. Nor, as we shall soon see,
is it a matter of decisive importance whether such statements
were made with intent to deceive, or were made in entire
good faith, in the belief that they were true, if it further
appears that they were relied upon, and did, in fact, mis-
lead the plaintiff. It is not now denied that, when plain-
tiff executed the release, he had, in fact, received the serious
injury we have mentioned. Nor is it denied that this fact
was wholly unknown to him, and, if known by the physician
or by the defendant or its claim agent, neither had revealed
that fact to the injured man. For present purposes, it
may be conceded that this condition was unknown to all
parties, and that they in good faith believed that the inju-
ries were temporary only. In such case, the law does not
leave the plaintiff remediless. The question as to the effect
of a mutual mistake in such cases was before us in *Red-
dington v. Blue & Raftery*, 168 Iowa 34. There, the injured
servant, six weeks after his injury, executed a written re-
lease of his claim for damages. Later, it was found that he
had sustained an injury of serious character; and it was
held that the release could be avoided, upon showing that
the settlement was arrived at and agreed to upon the mis-
taken belief or supposition that plaintiff's injuries were
only such as were then known. So, in the later case of
*Malloy v. Chicago G. W. R. Co.*, 185 Iowa 346, the servant
had been injured, and, after some treatment, was pronounced
well, and fit to work, and a settlement was had and re-
lease executed, both employer and employee relying on the
physician's statement. It developed, however, that the em-
ployee had not recovered, and was unable to work. In hold-
ing that the servant could avoid the release given by him,
on the ground of mistake, we quoted approvingly from
*Houston & T. C. R. Co. v. Brown*, (Tex.) 69 S. W. 651, as

follows (after reference to a physician's statement that a broken arm had knitted, and the arm would be all right) :

"The fact that the statement made by Stewart was not intentionally false does not affect the right of the appellee to have the release set aside, if he was misled by the statement, and executed the release believing the statement was true. In such a case, innocent misrepresentation may as well be the basis of relief as where such statements are intentionally false."

We also said that:

"Though the release is general, covering injuries of every kind and nature, and extending until doomsday, inquiry concerning the nature of the consideration and for what computed was permissible, and, as we think, was not precluded by the terms of the release." *Malloy v. Chicago G. W. R. Co.,* 185 Iowa 354.

The *Haigh* case, supra, is also in line with this principle. To the same effect is *McCarty v. Houston & T. C. R. Co.,* 21 Tex. Civ. App. 568 (54 S. W. 421).

The case of *Jacobson v. Chicago, M. & St. P. R. Co.,* 132 Minn. 181 (156 N. W. 251), affords another pertinent illustration of the principle. Plaintiff, a passenger on defendant's railway, was injured in a wreck, and, as in the present case, the injuries so sustained included an impacted fracture of the thigh and dislocation of the sacroiliac joint, and, as in this case, also, this feature of the injury was not discovered until after plaintiff had released the company on payment of $150. In securing this release, both the physician and the claim agent told plaintiff that he had no broken bones, and that he was suffering only from bruises of a temporary character. In ruling that a release so procured may be set aside, whether the representations to the plaintiff were made with or without fraudulent intent, the court says:

"In such cases, the courts grant relief either upon the

ground of fraud in law, sometimes spoken of as constructive fraud, or mutual mistake. It is not material whether it be termed fraud in law or mistake."

In support of its conclusion it cites our own case of *Haigh v. White Way Laundry Co.*, supra.

In *Marple v. Minneapolis & St. L. R. Co.*, 115 Minn. 262 (132 N. W. 333), the same court had to deal with another case, quite analogous to the one at bar, in that the fraud and misrepresentation charged were in reporting to plaintiff that his physician said he would be well, and able to go to work in three weeks, and there was testimony tending to show that such representation was untrue, and that plaintiff, relying thereon, was misled. This was held to be sufficient ground for impeaching the settlement. The same ruling was had in the similar case of *Peterson v. Chicago, M. & St. P. R. Co.*, 38 Minn. 511; also in *Fleming v. Brooklyn Heights R. Co.*, 95 App. Div. 110 (88 N. Y. Supp. 732).

Again, in passing upon the question whether a release may be disregarded as having been procured by fraud or mistake or inequitable advantage, it is well settled that evidence is admissible tending to show that

7. RELEASE: evidence: physical and mental condition.

the settlement was obtained when the party seeking to avoid it was still suffering from his injury, was sick or distressed, or unnerved and unfit to cope with the other party, or to properly apprehend and protect his legal rights.

Referring to this subject on the former appeal, we said that, where such settlements are made with injured and necessitous persons who have not had the aid of counsel, they should be closely scrutinized.

In *Mensforth v. Chicago Brass Co.*, 142 Wis. 546, the plaintiff had been in the hospital 10 days or more when a release was obtained from him upon payment of $100. In reversing the ruling of the trial court directing a verdict for defendant, it is mentioned as an important circum-

stance that plaintiff was, at the time, still "suffering pain, and was unable to sit up, and not in condition to carefully consider his rights in the matter;" and, after reciting other features of the case, the opinion quotes approvingly from *Atchison, T. & S. F. R. Co. v. Cunningham,* 59 Kan. 722, as follows:

"Where such unseemly haste is made in obtaining settlements with parties who have sustained such serious injuries, and where the amount paid is so trifling and utterly disproportionate to any just compensation, it seems like wasting time to nicely discuss questions of evidence bearing on plaintiff's capacity to transact business."

See, also, *McLean v. Equitable Life Assur. Soc.,* 100 Ind. 127, and *Stone v. Chicago & W. M. R. Co.,* 66 Mich. 76 (33 N. W. 24).

So, too, in *Platt v. American Cement Plaster Co.,* 169 Iowa 330, where a release by an injured employee was set aside, this court held it not error for the court to expressly instruct the jurors that, in determining whether plaintiff fully comprehended the nature and effect of the instrument, they could consider the evidence tending to show that he was lying in bed, prostrated, and distracted by the pain which came to him from the injury he had received.

The rule to be deduced from the precedents is not that, in order to justify an avoidance of a release, it must be established that he was, at the time, a mental incompetent. It is sufficient if it appears that, by reason of bodily injury or infirmity, or mental distraction occasioned thereby, he is, to use the language of the Wisconsin court, supra, unable to "carefully consider his rights in the matter," and if it further appears that advantage was taken of that condition by the other party, to obtain a settlement for a very inadequate consideration. Inadequacy alone, if so great as to shock the conscience, has been held enough to require

that the release be avoided. *Russell v. Dayton Coal & Iron Co.*, 109 Tenn. 43 (70 S. W. 1).

There is still another feature of this case which should not be overlooked. We have already noted that, by the ruling of the court below on the first trial, the evidence of

8. EVIDENCE: opinion evidence: inability to maintain action.

Woodbridge's statement to plaintiff that he was a lawyer, experienced in such cases, had looked into the facts of this case, and found that the defendant was in no manner liable, was taken from the consideration

of the jury, the theory of the court being, as we assume, that these matters were mere expressions of Woodbridge's personal opinion, on which plaintiff relied at his peril. The verdict and judgment on that trial having been for the plaintiff, the appeal taken therefrom by defendant did not involve this ruling, and it was, therefore, not in any way discussed in reversing that judgment; but, in view of the necessity of a new trial, and of the fact that this question remains in the case, where it must have the attention of the court or jury, or both, we think it proper to speak of it.

We have already said that mere expressions of opinion, honestly entertained, do not amount to fraud; but the statement of a fact must be construed as such, even though it partakes in some degree of the nature of an opinion. The physician who says that his patient is or is not afflicted with tuberculosis or with typhoid fever asserts a fact, and not a mere speculative opinion, and the lawyer who informs his client that a given act constitutes a public offense states an alleged fact, even though his statement is based upon his opinion as to the effect of a statute. Even the same language which, under some circumstances, would clearly be classed as an opinion merely, may, under other conditions. be substantive statements, on which, if the hearer rely to his injury, a right of action may be based.

In this case, if the witnesses speak truthfully, Woodbridge dissuaded the plaintiff and wife from seeking independent counsel, telling them it was an unnecessary expense, and invited them to depend upon him and the defendant, and assured them that he spoke as a lawyer of experience, who know the situation, and that they were without any remedy at law. Possibly, a more experienced or more wary man, under less handicap from his injuries and necessities, would not have been content to accept advice so given; but there is no principle of law which says that, if plaintiff did accept it and act upon it, he did so at his peril. *Sanford v. Royal Ins. Co.*, 11 Wash. 653 (40 Pac. 609, 614) ; also, *Hidden v. Exeter, H. & A. S. R. Co.*, 72 N. H. 422 (57 Atl. 333) ; *Indiana D. & W. R. Co. v. Fowler*, 201 Ill. 152 (66 N. E. 394) ; *Kansas City, M. & B. R. Co. v. Chiles*, (Miss.) 38 So. 498. Woodbridge, in these statements, was not giving vent to a mere opinion; he was stating facts or matters which he desired plaintiff to accept and act upon as facts, and, for all we need say, statements which he honestly believed true. Having thus invited and obtained the confidence of the plaintiff, the defendant, in whose interest this was done, if it was done, and for whom he thus obtained release from a liability for which (if the plaintiff be otherwise found entitled to recover), the sum paid is a ridiculously inadequate consideration, cannot be permitted to retain the benefit of such release, on the plea that plaintiff yielded to such inducement at his own risk. What we here say is not to be construed as a denial or modification of the rule approved by us in *Haigh v. White Way Laundry Co.*, supra, and *Seymour v. Chicago & N. W. R. Co.*, 181 Iowa 218, that the mere statement of an honest opinion, as distinguished from an assertion of fact, will not amount to fraud, even though such opinion be incorrect. It is only when the statements become, in legal effect,

9. EVIDENCE: opinion evidence: fraudulent purpose.

representations of fact, or the expression of opinion is insincere, and made with ulterior purpose, to deceive or mislead the injured person, that they may be treated as fraudulent. Whether such is their quality and character in any given case cannot often be determined as a matter of law; but the answer to that inquiry, ordinarily at least, is to be deduced, not alone from the words employed, but also from the circumstances attending and characterizing their use; and this, under all ordinary circumstances, is a jury question.

We have held, as is illustrated in the cases cited, supra, that the assurance by the employer and by the surgeon that the injured person has recovered from his hurt, and is in physical condition to resume work, is a representation of fact, though having its foundation in opinion, and that a settlement obtained upon such representation will be invalidated, if it later appear that such assurance was false or mistaken. The justice and propriety of this rule is too apparent to require argument.

The principle was applied by us in *Rauen v. Prudential Ins. Co.*, 129 Iowa 725, where the defendant, by its agent, denied liability on an insurance policy, because of an alleged forfeiture, and obtained a release upon payment of a mere fraction of the insurance. The agent's statement to Mrs. Rauen that she had no cause of action, and that the company had a perfect defense, though, on the theory of appellant in this case, a statement of his legal opinion, was, nevertheless, a representation of an alleged existing fact, sufficient to avoid a release so procured. The same rule was applied by the New York Court in a similar case. *Berry v. American Cent. Ins. Co.*, 132 N. Y. 49. In the latter case, the court says:

"The defendant must be presumed to have known that it was liable for the whole loss, and, by falsely representing that, under the law applicable to the case, the policy was

void, when, in fact, it was valid, it induced the plaintiff to rely upon the superior knowledge that it possessed upon the subject, and to surrender to it his claim. This clearly constituted fraud, and there would be manifest injustice in upholding a settlement under such circumstances."

See, also, *Nelson v. Chicago & N. W. R. Co.,* 111 Minn. 193 (126 N. W. 902) ; *Kelly v. Chicago, R. I. & P. R. Co.,* 138 Iowa 273.

It is true, of course, that, if an injured person, asserting a right to damages, acting freely, and without being in any manner deceived or misled by the other party, sees fit to compromise or surrender his claim for a small consideration, he will not, after executing a release, be permitted to avoid its effect, simply because, on later reflection, he repents his action. It is only where such release has been procured by fraud or by mistake, or under circumstances showing such superior advantage on the part of the releasee as taints the transaction with constructive fraud, that the settlement will be treated as void. When, however, there is any evidence fairly tending to show that it ought to be avoided on any of these grounds, or to justify such finding by a jury, the question so presented is for the jury; and this, we are convinced, is the nature of the case presented by the record. Such being our conclusion, it follows that the judgment of the trial court must be reversed, and cause remanded for a new trial.—*Reversed.*

LADD, C. J., EVANS, GAYNOR, PRESTON, SALINGER, and STEVENS, JJ., concur.